IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

JAMIE CEJA,                          )
                                     )
                Petitioner,          )
                                     )
        v.                           )        CV 115-018
                                     )        (Formerly CR 111-359)
UNITED STATES OF AMERICA,            )
                                     )
                Respondent.          )
_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

Before the Court is Petitioner's motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence.  The Court **REPORTS** and **RECOMMENDS** Petitioner's motions to appoint counsel (doc. no. 22; CR 111-359, doc. no. 119) be **GRANTED IN PART** and **DENIED IN PART**, Petitioner's motion to amend be **DENIED** (doc. no. 11), Petitioner's § 2255 motion be **DENIED**, this civil action be **CLOSED**, and a final judgment be **ENTERED** in favor of Respondent.

**I.     BACKGROUND**

Law enforcement arrested Petitioner in North Augusta, South Carolina, on August 20, 2011, after he and an accomplice sold cocaine to cooperating witness Jerome Greene.  United States v. Ceja, 543 F. App'x 948, 950 (11th Cir. 2013).  The arrest culminated months of investigation by the Drug Enforcement Agency ("DEA") and officers from Georgia and South Carolina.  Id. at 951.  Petitioner admitted to the arresting officers that he supplied Mr. Greene with cocaine, had ties to the Mexican drug cartel "La Familia," and received

hundreds of pounds of marijuana from the cartel.  Id.  Petitioner agreed to cooperate against La Familia, and led investigators on August 20, 2011, to two storage units containing approximately 4.5 kilograms of cocaine and 288 grams of methamphetamine.  Id.  Because of Petitioner's immediate cooperation, law enforcement released him.  Id.  Later that week, Petitioner fled to Tijuana, Mexico, where he informed investigators he was no longer willing to cooperate.  Id.  In September 2011, Mexican agents arrested Petitioner and returned him to the United States.  Id.

On November 2, 2011, a grand jury in the Southern District of Georgia charged Petitioner with conspiracy to distribute and possession with intent to distribute controlled substances in violation of 21 U.S.C. § 846 (Count 1), and possession with intent to distribute schedule I and II controlled substances in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 2).  United States v. Ceja, CR 111-359, doc. no. 1 (S.D. Ga. Nov. 2, 2011) ("CR 111-359").  Trial began on July 9, 2012, before United States District Judge J. Randal Hall, with Edward J. Coleman, III[1] serving as defense counsel and Assistant U.S. Attorney Patricia G. Rhodes serving as prosecutor.  After a three-day trial, the jury found Petitioner guilty on both counts.  (Id., doc. no. 67.)  Petitioner timely filed a motion for new trial that Judge Hall denied on August 13, 2012.  (Id., doc. nos. 71, 76.)  On January 22, 2013, Judge Hall sentenced Petitioner to 327 months for Count One and 327 months for Count Two, to be served concurrently.  (Id., doc. no. 84.)

---

[1] On June 28, 2013, the United States Court of Appeals for the Eleventh Circuit appointed Mr. Coleman as a U.S. Bankruptcy Judge for the Southern District of Georgia. This Report and Recommendation will thus refer to him as Judge Coleman to reflect his current office.

A.    **Trial Testimony**

1.    **Investigator Joel Danko's Trial Testimony**

Investigator Joel Danko, a DEA task force officer employed by the Richmond County Sheriff's Office ("Investigator Danko"), testified at Petitioner's trial that law enforcement began surveillance of Petitioner on September 30, 2010.  (Id., doc. no. 77 ("Trial Tr."), pp. 61-62.)  Investigator Danko determined Petitioner was the narcotics supplier of Mr. Greene. (Id.)  On June 13, 2011, Investigator Danko initiated a raid of Mr. Greene's storage unit and found 5.5 pounds of marijuana.  (Id. at 64.)  Two months later, on August 17, 2011, Investigator Danko left his DEA business card on Mr. Greene's car, and Mr. Greene contacted Investigator Danko on August 18, 2011, expressing his desire to cooperate.  (Id. at 67.)

On August 19, 2011, Mr. Greene, under the direction and supervision of Investigator Danko, placed a phone call to Petitioner to arrange a cocaine transaction for the next day at the Golden Corral.  (Id. at 72, 76.)  Before the meeting, Investigator Danko equipped Mr. Greene with a recording device, and set up surveillance of the Golden Corral parking lot. (Id. at 77-78.)  When Mr. Greene arrived at the Golden Corral, Investigator Danko witnessed Petitioner enter Mr. Greene's automobile and retrieve $6,500 from Mr. Greene.  No narcotics were exchanged, but Petitioner and Mr. Greene arranged to meet again immediately at an apartment complex in North Augusta, South Carolina.  (Id. at 86.)  At that location, Mr. Greene received eighteen ounces of cocaine from Mr. Jorge Luis Dias-Ventura, Petitioner's accomplice.  Investigator Danko arrested Petitioner as he left the apartment complex and found $11,950 in his vehicle during a search.   (Id. at 90.)

Investigator Danko met with Petitioner that same day in a North Augusta jail for

questioning.  (Id. at 106.)  Investigator Danko advised Petitioner of his Miranda rights, and Petitioner signed a Miranda waiver freely and voluntarily.  (Id. at 107.)  Petitioner agreed to cooperate after Investigator Danko and Phillip Turner, an officer with the South Carolina Law Enforcement Division, played recordings of the controlled buy.  (Id. at 112.)  Petitioner admitted he was a lieutenant in the La Familia Cartel and told Investigator Danko he had drugs in storage units nearby.  (Id. at 114.)  Petitioner led Investigator Danko and Officer Turner to two storage units, in Augusta, Georgia, and Marietta, Georgia, and gave them 4.5 kilograms of cocaine and 288 grams of methamphetamine.  (Id. at 117-18, 121, 124.) Petitioner agreed to return the following Tuesday, and Investigator Danko released Petitioner from custody in light of his immediate and extraordinary cooperation.  (Id. at 131.)

### 2.    Informant Jerome Greene's Trial Testimony

Mr. Greene testified to first meeting Petitioner in April 2010 at the Augusta Transitional Center, a halfway house for offenders.  (Id. at 311.)  Petitioner and Mr. Greene discussed selling narcotics, and in July 2010, Petitioner contacted Mr. Green and fronted him four ounces of cocaine.  (Id. at 321.)  After Petitioner's release from the Augusta Transitional Center, he fronted Mr. Greene nine more ounces of cocaine.  (Id. at 326.)

Finding Investigator Danko's DEA business card on his truck on August 17, 2011, Mr. Greene called Investigator Danko and arranged a meeting where he agreed to cooperate in the investigation against Petitioner.  (Id. at 333-34.)  On August 19, 2011, Mr. Greene called Petitioner from his home to set up a deal for eighteen ounces of cocaine, and Petitioner confirmed he had the narcotics.  (Id. at 334, 339, 340.)  Petitioner and Mr. Greene agreed to meet at the Golden Corral, and Mr. Greene brought $6,500 of his own money that he owed Petitioner for previously fronted narcotics.  (Id. at 342.)

When Mr. Greene arrived at the Golden Corral, Petitioner got into his truck and Mr. Greene gave him $6,500.  (Id. at 343.)  Petitioner then instructed Mr. Greene to meet him at a construction site, but later changed the location to an apartment complex.  (Id. at 346.)  When Mr. Greene arrived at the apartment complex, Mr. Dias-Ventura got into Mr. Greene's car and gave him eighteen ounces of cocaine in a clear, plastic Ziploc bag.  (Id. at 349.) Investigator Danko arrested Petitioner as he was leaving the apartment complex.  (Id. at 350.)

**B.      Appeal**

On July 11, 2012, a jury found Petitioner guilty of Counts One and Two after a three-day trial.  Petitioner was sentenced on January 22, 2013.  On January 30, 2013, Petitioner appealed to the Eleventh Circuit Court of Appeals, arguing the District Court abused its discretion by:  (1) denying his motion to dismiss the indictment for lack of personal jurisdiction; (2) denying his pretrial motion to compel discovery; (3) admitting under Fed. R. Evid. 404(b) a certified copy of Petitioner's prior conviction for marijuana trafficking; (4) denying his motion for acquittal as to the conspiracy count; and (5) instructing the jury on flight.  Ceja, 543 F. App'x at 948-58.  The Eleventh Circuit affirmed the convictions.

**C.      Petitioner's § 2255 Motion**

In this § 2255 motion, Petitioner raises the following grounds of ineffective assistance of counsel:

(1)      Counsel was ineffective for failing to argue the issues below in closing argument, in a Rule 29 motion for acquittal, and in the Rule 33 motion for a new trial:
      (a)      Counsel failed to argue that law enforcement did not perform fingerprint analysis on his storage unit, which could have exonerated him.
      (b)      Counsel was ineffective for failing to argue that Investigator Danko's testimony was inconsistent regarding Petitioner's role in the exchange.

5

(c)     Counsel failed to argue the money Mr. Greene allegedly gave Petitioner was not counted or photographed.

(d)     Counsel should have objected to Investigator Danko's testimony regarding Petitioner's confession.

(e)     Counsel should have argued that Investigator Danko's testimony conflicted with Mr. Greene's testimony regarding a third person.

(f)     Counsel should have uncovered the secret relationship between Investigator Danko and Mr. Greene which suggests that they committed perjury.

(g)     Counsel should have argued that Investigator Danko's and Mr. Greene's testimonies were inconsistent on where the August 19, 2011 phone call was placed.

(h)     Counsel was ineffective for not challenging Investigator Danko's inconsistent statements as to the ownership of the gun found in Mr. Greene's storage unit.

(i)     Counsel should have argued that Investigator Danko's testimony made him an unreliable witness.

(j)     Counsel should have argued Investigator Danko's testimony violated Rule 404(b) of the Federal Rules of Evidence as it concerned (1) surveillance of Petitioner on September 30, 2010, (2) court ordered GPS location tracking on Petitioner's cellphone, (3) subpoenaed phone records, and (4) Petitioner's involvement in "La Familia."

(k)     Counsel should have argued that Investigator Danko's testimony that Officer Turner did not inform Investigator Danko that Petitioner was a Mexican citizen was not believable.

(l)     Counsel should have argued that Investigator Danko's and Mr. Greene's testimonies were inconsistent regarding when they first made contact.

(m)

(i-ii)     Counsel should have challenged Mr. Greene's testimony as being inconsistent regarding the first time Petitioner sold Mr. Greene drugs.

(iii-iv) Counsel should have argued that Mr. Greene's testimony that he only had one phone, and six to seven thousand fronted out to four different people, was not believable.

(v)     Counsel should have argued that law enforcement did not subpoena Petitioner's or Mr. Greene's phone records, revealing the sloppiness of the investigation.

(vi)     Counsel should have argued that because Agent

6

> Lukich, Investigator Danko, and AUSA Rhodes all met with Mr. Greene before he testified, it was possible that Mr. Greene was pressured, intimidated, or threatened into framing Petitioner.

(2)    Counsel should have objected to the prosecutorial misconduct in closing remarks.  AUSA Rhodes wrongfully argued that the community could "send[] a message" by convicting Petitioner.  Appellate counsel was equally ineffective for failing to raise this issue on appeal.

(3)    Counsel should have objected to the prosecutorial misconduct where AUSA Rhodes called Mr. Greene, "Investigator Greene."  Counsel should have objected to AUSA Rhodes's closing remarks where she called Mr. Greene a "government agent."

(4)    Counsel was ineffective for failing to object to AUSA Rhodes's improper vouching for Mr. Greene during closing.

(5)    Counsel should have challenged AUSA Rhodes's closing that implied taxpayers should not have to pay for a thorough investigation.

(6)    Counsel should have moved the Court to question "sleeping jurors," and should have moved for a mistrial.

(7)    Counsel rendered ineffective assistance by vouching for the government's witness.

(8)
    (a)    Counsel should have challenged Judge Hall's remark that the attorneys worked hard.
    (b)    Counsel should have challenged Judge Hall's remark that the attorneys would not mislead the jury.
    (a-b)  AUSA Rhodes committed fraud and perjury in covering up an insufficient, sloppy, and corrupt investigation.

(9)    Counsel was ineffective for failing to object to Agent Lukich's presence at the government's table.

(10)    Counsel was ineffective for failing to object to the admission of transcripts that were sent to the jury room during deliberations.

(11)    Counsel should have challenged Investigator Danko as being an expert on the value of drugs.

(12)

    (a)    Counsel failed to investigate and make hearsay objections to statements Agent Lukich made that were admitted at trial.

    (b-d)    Counsel should have challenged the statements other witnesses made regarding Agent Lukich's presence in the courtroom.

    (e-f)    Counsel should have offered Agent Lukich's report and cross examined him about his involvement.

(13)    Counsel was ineffective for failing to object to hearsay regarding surveillance of a lookout.

(14)

    (a)    Counsel was ineffective for failing to object to evidence from an unrelated conspiracy.

    (b)    Counsel was ineffective for failing to object to the testimony regarding the La Familia drug cartel.

(15)

    (a)    Counsel was ineffective for failing to address Petitioner's alleged Miranda violations via a motion to suppress or objection at trial.

    (b-c)    Counsel was ineffective for not calling Officer Turner as a witness, which allowed Officer Turner to withhold material information.  Officer Turner's testimony could have proven that law enforcement intentionally withheld information in order to illegally extradite Petitioner to the United States.

(See doc. nos. 1, 2.)

## II.   DISCUSSION

### A.   Petitioner's Motions for Counsel.

Petitioner moves for counsel, arguing he is indigent, his case is complex, and he is untrained in the field of law.  (Doc. no. 22); CR 111-359, doc. no. 119, pp. 2-3.  There is no automatic constitutional right to counsel in habeas proceedings.  See Pennsylvania v. Finley, 481 U.S. 551, 555 (1987); United States v. Webb, 565 F.3d 789, 794 (11th Cir. 2009) (citing Barbour v. Haley, 471 F.3d 1222, 1227 (11th Cir. 2006)); Hooks v. Wainwright, 775 F.2d

1433, 1438 (11th Cir. 1985).  Under 18 U.S.C. § 3006A(a)(2)(B), the Court may appoint counsel for an indigent litigant seeking relief under 28 U.S.C. § 2255, but such requests are discretionary when "due process or the 'interests of justice'" so require.  Hooks, 775 F.2d at 1438. Moreover, appointment of counsel is "a privilege that is justified only by exceptional circumstances[.]"  McCall v. Cook, 495 F. App'x 29, 31 (11th Cir. 2012).  In sum, "[i]t is well established that indigents applying for federal or state post-conviction relief, even those sentenced to death, have no federal constitutional right to counsel except in those rare cases where under the circumstances the fundamental fairness component of due process requires appointment of counsel."  Donald E. Wilkes, Jr., Federal Postconviction Remedies and Relief Handbook § 2.2, at 147 (2016 ed.) (citations omitted).  However, if the Court conducts an evidentiary hearing, pursuant to Rule 8(c) of the Rules Governing Section 2255 Proceedings, counsel must be appointed for a petitioner who qualifies under 18 U.S.C. § 3006A.

The Court scheduled an evidentiary hearing on Petitioner's Ground 15(a) claim, and appointed Mr. Wendell E. Johnston, Jr., for the limited purpose of representing Petitioner at the evidentiary hearing on Petitioner's Ground 15(a) claim.  However, Mr. Johnston is only responsible for filing any objections to this Report and Recommendation as to Petitioner's Ground 15(a) claim.  (See doc. no. 14.)

Petitioner is not entitled to counsel on his remaining claims because the Court finds no exceptional circumstances justifying the appointment of counsel.  McCall, 495 F. App'x at 31.  Petitioner has been able to file motions and extensive briefing on his own behalf and has been able to adequately present his numerous claims to the Court.  Thus, Petitioner's motions for counsel should be **GRANTED IN PART** and **DENIED IN PART**.  Doc. no. 2;

CR 111-359, doc. no. 119.  Petitioner is responsible for filing any objections to this Report and Recommendation's rulings on all claims other than Ground 15(a).

### B.   The Standard for Ineffective Assistance of Counsel Under Strickland.

Ineffective assistance of counsel claims are subject to the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  See Massaro v. United States, 538 U.S. 500, 505 (2003).  Petitioner must show that counsel was constitutionally ineffective under the two prongs of Strickland by proving defense counsel's performance was deficient and prejudicial. Under the first prong, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.  In this regard, "[a] petitioner must overcome a strong presumption of competence, and the court must give significant deference to the attorney's decisions."  Hagins v. United States, 267 F.3d 1202, 1204-05 (11th Cir. 2001).

Strategic decisions are entitled to a "heavy measure of deference."  Strickland, 466 U.S. at 691.  Indeed, "strategic choices are 'virtually unchallengeable.'"  Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998) (citing Strickland, 466 U.S. at 690).  "[A] court should be highly deferential to those choices made by defense counsel in the conduct of a trial that are arguably dictated by a reasonable trial strategy."  Devier v. Zant, 3 F.3d 1445, 1450 (11th Cir. 1993).  To show that an attorney's choice of strategy is unreasonable, a petitioner must show that no competent counsel would have made such a choice.  Strickland, 466 U.S. at 690.

Thus, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id.  "The relevant question is not what actually motivated counsel, but what reasonably could have motivated counsel."

Gordon v. United States, 518 F.3d 1291, 1301 (11th Cir. 2008).  "Given the strong presumption in favor of competence, the petitioner's burden of persuasion – though the presumption is not insurmountable – is a heavy one."  Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted).  "The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted . . . ."  Ward v. Hall, 592 F.3d 1144, 1164 (11th Cir. 2010) (citing Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc)).

A court, however, "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Strickland, 466 U.S. at 697; see Brooks v. Comm'r, Ala. Dep't of Corr., 719 F.3d 1292, 1301 (11th Cir. 2013).  Under the prejudice prong of Strickland, a petitioner must show "that there 'is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  Brooks, 719 F.3d at 1300 (quoting Strickland, 466 U.S. at 694).  As the Eleventh Circuit has ruled, a petitioner must affirmatively prove prejudice that would undermine the results of the proceedings because "attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.  That the errors had some conceivable effect on the outcome of the proceeding is insufficient to show prejudice."  Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir. 2004) (citations and internal quotations omitted).

Ineffective assistance of appellate counsel claims are subject to the same two-part test enunciated in Strickland.   Philmore v. McNeil, 575 F.3d 1251, 1264 (11th Cir. 2009). Appellate counsel is not ineffective for failing to raise a frivolous argument on appeal. United States v. Winfield, 960 F.2d 970, 974 (11th Cir. 1992).   Nor does the Sixth Amendment require appellate advocates to raise every non-frivolous issue.   Philmore, 575 F.3d at 1264.   Appellate counsel is not ineffective for failing to raise claims reasonably considered to be without merit.   United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000).

### C.   Ground One Fails to Establish Deficient Performance and Prejudice With Respect to the Alleged Failure of Judge Coleman to Make the Various and Sundry Arguments Listed in Subsections (a) to (m).

#### 1.   Ground 1(a)

Trial included testimony by Investigator Danko that, after his arrest, Petitioner led law enforcement agents to two storage units, cut the lock off one unit, unscrewed a lid to a cooler, pulled out a bag containing a half kilogram of cocaine, and handed it to law enforcement.  (Trial Tr. 117.)  In Ground 1(a), Petitioner claims Judge Coleman did not point out law enforcement's failure to perform fingerprint analysis on the storage units that could have exonerated him or implicated others.  (Doc. no. 2, pp. 7-8.)  The argument misstates the record and is insufficient to show deficient performance and prejudice.

Contrary to Petitioner's argument, Judge Coleman made this very point when he cross-examined Investigator Danko:

| | |
|---|---|
| Judge Coleman: | I hate to keep dwelling on fingerprints, but a number of those objects would be fingerprintable, correct? |
| Investigator Danko: | Correct. |

12

| | |
|---|---|
| Judge Coleman: | And were any of them dusted for prints? |
| Investigator Danko: | It was almost to no purpose.  [Petitioner] reached in the cooler and pulled the half-kilogram out and gave it to me.   I didn't think that him relinquishing custody of an item would require me to fingerprint it for authenticity.  He knew it was there.  He said he maintained the unit, and he gave it to me. |
| Judge Coleman: | Well I understand that.  But that wasn't my question.  My question was, was anything in that unit fingerprinted? |
| Investigator Danko: | Printed or printable? |
| Judge Coleman: | Printable.  Let's start with that. |
| Investigator Danko: | Yes. There would be several items in there that were fingerprintable. |
| Judge Coleman: | And was anything fingerprinted? |
| Investigator Danko: | No. |
| Judge Coleman: | And so we don't have any evidence – we don't have any fingerprint evidence tying [Petitioner] to the contents of that storage unit immediately prior to him going in there and touching stuff at your direction; correct? |
| Investigator Danko: | Correct. |

(Trial Tr. 244-49.)  Judge Coleman also pointed out the lack of fingerprinting on objects seized from a storage unit in Marietta, Georgia, and on the bag containing the cocaine recovered in the aftermath of the controlled buy.  (Id. at 250, 306.)

While it is true Judge Coleman did not emphasize this point during closing argument, or in Rule 29 and 33 motions, the failure to do so did not cause Petitioner to suffer any

13

prejudice.   Trial strategy is entitled to significant deference.   <u>Strickland</u>, 466 U.S. at 691; <u>Waters</u>, 46 F.3d at 1512; <u>Devier</u>, 3 F.3d at 1450.   Petitioner has not established Judge Coleman's trial strategy with respect to fingerprinting was objectively unreasonable.   In light of the considerable evidence linking Petitioner to the storage units and drugs contained therein, there is no reasonable probability the outcome would have been different had Judge Coleman raised the lack of fingerprinting in closing or in Rule 29 or Rule 33 motions. Indeed, the government had a strong rebuttal that Petitioner led Investigator Danko to the storage units, admitted he maintained the units, and handed over the controlled substances hidden in those units.

### 2.      Ground 1(b)

Petitioner claims Judge Coleman was ineffective for failing to argue Mr. Jorge Luis Dias-Ventura could have been the seller of cocaine to Mr. Greene during the controlled buy since law enforcement did not witness the transaction and did not conduct voice analysis of the audio recording.  (<u>See</u> doc. no. 2, p. 8.)  The argument would have undoubtedly failed, and it was neither deficient performance nor prejudicial for Judge Coleman not to make it.

There is ample evidence Petitioner sold the cocaine to Mr. Greene.   After the controlled buy, Petitioner confessed to selling cocaine to Mr. Greene.  (Trial Tr. 111-12.) Furthermore, Mr. Greene's testimony confirms Petitioner was the seller.   Mr. Greene testified he called Petitioner to arrange the controlled buy, met with him at the Golden Corral where he paid Petitioner $6,500, and it was Petitioner who gave instructions to meet at an apartment complex.  (<u>Id.</u> at 338, 345.)  Mr. Greene testified he saw Petitioner enter the apartment complex immediately prior to receiving the cocaine from Mr. Dias-Ventura.  (<u>Id.</u> at 347.)    Petitioner's attempt to shift blame does not render his counsel's performance

ineffective in light of the overwhelming weight of evidence against him.

Trial strategy is entitled to significant deference.  Strickland, 466 U.S. at 691; Waters, 46 F.3d at 1512; Devier, 3 F.3d at 1450.  Petitioner has not established Judge Coleman's trial strategy with respect to the controlled buy was objectively unreasonable.  Furthermore, in light of the considerable evidence of Petitioner's participation in the controlled buy as the seller, there is no reasonable probability the outcome would have been different had Judge Coleman attempted to argue Mr. Dias-Ventura was the seller instead of himself in closing or in Rule 29 or Rule 33 motions.

### 3.     Ground 1(c)

Petitioner argues Judge Coleman was ineffective because he did not argue that law enforcement failed to count or photograph the cash payment of $6,500 made by Mr. Greene to Petitioner during the controlled buy.  (Doc. no. 2, p. 8.)  It was neither deficient performance nor prejudicial for Judge Coleman not to make this argument.

 At trial, Mr. Greene testified he owed Petitioner $6,500 for drugs Petitioner fronted him.  (Trial Tr. 342.)  Mr. Greene testified he stored the $6,500 at his home before using it in the controlled buy.  (Id. at 386-87.)  This was Mr. Greene's personal money and was not provided to Mr. Greene by law enforcement.  (Id. at 389-90.)  After Mr. Greene paid Petitioner the money in the Golden Corral parking lot, Petitioner arranged a location in North Augusta, South Carolina, where the drugs were to be exchanged.  (Id. at 82-83.)  After the drugs were exchanged and Petitioner was arrested, law enforcement agents recovered a clear plastic bag with $11,950 from Petitioner's vehicle, and recovered the drugs from Mr. Greene's vehicle.  (Id. at 83-90.)

Petitioner has not established Judge Coleman's trial strategy with respect to the

controlled buy was objectively unreasonable.  Furthermore, in light of the considerable evidence of Petitioner's participation in the controlled buy as the seller, there is no reasonable probability the outcome would have been different had Judge Coleman attempted to argue the minor point that no one photographed or counted $6,500 of Mr. Greene's personal money used in the controlled buy in closing or in Rule 29 or Rule 33 motions.

### 4.    Ground 1(d)

In Ground 1(d), Petitioner alleges his counsel was ineffective for failing to argue his confession was inadmissible hearsay because the original recording of the confession malfunctioned.  (Doc. no. 2, pp. 8-9.)  The confession is an admission by a party opponent that falls within the hearsay exception in Fed. R. Evid. 801(d)(2).  Consequently, the District Court properly admitted Investigator Danko's testimony concerning Defendant's confession, and Judge Coleman was not deficient for failing to make a meritless hearsay objection.  See Fed. R. Evid. 801(d)(2)(A); Chandler v. Moore, 240 F.3d 907, 917 (11th Cir. 2001).

### 5.    Ground 1(e)

In Ground 1(e), Petitioner claims Judge Coleman was ineffective for failing to point out that, during the cash payment portion of the controlled buy on August 20, 2011, Investigator Danko testified he saw two people with Petitioner at the Golden Corral while Mr. Greene testified he only saw Petitioner.  (Id.)  Judge Coleman was not deficient because there was no contradiction in the first place.  Mr. Greene testified Petitioner entered his vehicle alone to receive the cash payment.  (Trial Tr. 338.)  After Mr. Greene left Golden Corral to meet with law enforcement agents, Investigator Danko observed Petitioner, Mr. Dias-Ventura, and another unidentified male leave the Golden Corral in another vehicle.  (Id. at 190.)

16

Even if such a minor contradiction existed between the testimony of Messrs. Green and Danko, Petitioner has not established Judge Coleman's trial strategy of not focusing on this contradiction was objectively unreasonable.  Furthermore, in light of the considerable evidence of Petitioner's participation in the controlled buy as the seller, there is no reasonable probability the outcome would have been different had Judge Coleman attempted to argue this minor point in closing or in Rule 29 or Rule 33 motions.

### 6.     Ground 1(f) & (g)

In Ground 1(f), Petitioner claims counsel was ineffective for failing to uncover a "secret relationship" between Mr. Greene and Investigator Danko.  (Doc. no. 2, p. 9.) Petitioner claims that when he met Mr. Greene in April 2010, Mr. Greene described Investigator Danko as a friend who had arrested Mr. Greene five years earlier in 2005.  (Doc. no. 2-1, p. 3.)  Petitioner claims the two conspired to commit perjury and frame him.  (Id.)  In Ground 1(g), Petitioner criticizes counsel for failing to argue that the testimonies of Messrs. Green and Danko are inconsistent concerning from what location Mr. Greene placed a call to Petitioner on August 19, 2011.  (See id. at 9.)

There is no evidence to support Petitioner's suspicions of a "secret relationship" and conspiracy to frame Petitioner.  In fact, the undisputed testimony at trial was that, on June 13, 2011, Investigator Danko executed a search warrant and raided Mr. Greene's storage unit, discovering Mr. Greene's personal effects, a firearm, and 5.5 pounds of marijuana.  (Trial Tr. 66, 173.)  Realizing his predicament, Mr. Greene agreed to cooperate against Petitioner, and on August 19, 2011, Mr. Greene called Petitioner to arrange the controlled buy.  (Id. at 72, 179, 327.)  Petitioner is incorrect in his belief of a contradiction concerning the location from which Mr. Greene made this phone call.  Mr. Greene testified the location was his home, and

Investigator Danko's testimony is silent concerning the location.  (Id. at 333.)

Petitioner has not established Judge Coleman's trial strategy was objectively unreasonable for failing to argue, in the absence of any supporting evidence, that there was a "secret relationship" and conspiracy to frame Petitioner, or inconsistency concerning location of the phone call.  Furthermore, there is no reasonable probability the outcome would have been different had Judge Coleman attempted to argue these points in closing or in Rule 29 or Rule 33 motions.

### 7.     Ground 1(h)

Ground 1(h) alleges Judge Coleman was ineffective for failing to emphasize Investigator Danko's contradictory testimony concerning ownership of a gun found in Mr. Greene's storage unit.  During cross examination, Investigator Danko alternatively stated Mr. Greene disavowed ownership of the gun and admitted ownership of the gun.  (Compare Trial Tr. 165-66 with Trial Tr. 179.)  Petitioner argues this one inconsistency rendered Investigator Danko's testimony unreliable, and allowed Mr. Greene to avoid a perjury charge.  (Doc. no. 2, p. 9.)

Petitioner has not established Judge Coleman's trial strategy was objectively unreasonable for failing to emphasize this minor discrepancy in Investigator Danko's testimony.  Furthermore, there is no reasonable probability the outcome would have been different had Judge Coleman emphasized this point in closing or in Rule 29 or Rule 33 motions.  Mr. Greene was not on trial, and whether he owned the firearm found in his storage unit was largely irrelevant to the outcome of Petitioner's trial.

### 8.     Ground 1(i)

In Ground 1(i), Petitioner claims Judge Coleman was ineffective for failing to argue

Investigator Danko's testimony made him an unreliable witness.   (Doc. no. 2, p. 10.)
Specifically, Petitioner alleges Investigator Danko believed Petitioner and Mr. Dias-Ventura
were involved in drug trafficking, yet let them go without charges which allowed Petitioner
to escape to Mexico.   (See id.)

Investigator Danko testified he released Mr. Dias-Ventura because Petitioner was
"adamant about the fact that as almost a condition of his cooperation would be that we would
allow [Dias-Ventura] to be released."   (Trial Tr. 202.)   Investigator Danko further explained
he released Petitioner because he agreed to return the following Tuesday and cooperate fully
in implicating a much larger drug trafficking organization.   (Id. at 113, 125.)   Although
Petitioner claims Investigator Danko's testimony was logically inconsistent, Investigator
Danko fully explained his rationale for releasing both Mr. Dias-Ventura and Petitioner.

Petitioner has not established Judge Coleman's trial strategy was objectively
unreasonable for failing to adopt this rather bizarre tactic of focusing on events that highlight
Petitioner's involvement in drug trafficking and his flight to Mexico.   There is no reasonable
probability the outcome would have been different had Judge Coleman emphasized this point
in closing or in Rule 29 or Rule 33 motions.

### 9.   Ground 1(j)

Claim 1(j) alleges Judge Coleman was ineffective for failing to object under Fed. R.
Evid. 404(b) to Investigator Danko's testimony that investigating officers surveilled
Petitioner on September 30, 2010, activated "a court ordered GPS location device" on
Petitioner's phone, subpoenaed Petitioner's phone records, and elicited from Petitioner an
admission he had been involved with the La Familia Cartel since he was fourteen years old.
(Doc. no. 2, p. 10.)

19

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). This rule extends only to extrinsic evidence, and "bad acts" evidence is not extrinsic if it is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." United States v. Cardenas, 234 F. App'x 892, 897 (11th Cir. 2007) (quoting United States v. Utter, 97 F.3d 509, 513 (11th Cir. 1996)). If evidence falls within one of the three prongs, it is not subject to Rule 404(b) because it is considered *res gestae.* United States v. Eckhardt, 466 F.3d 938, 946 (11th Cir. 2006). In addition, evidence of crimes, wrongs, or other acts are permissible for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(2).

Here, evidence Petitioner was surveilled on September 30, 2010, that investigators activated a court ordered GPS location device on Petitioner's phone, and subpoenaed Petitioner's phone records was not concerned with *other* crimes, wrongs, or acts, but with the underlying criminal investigation and charges Petitioner faced at trial. See Thomas v. Jones, 891 F.2d 1500, 1504-05 (11th Cir. 1989) (finding counsel was not ineffective for failing to object to evidence that was admissible as part of *res gestae*); see also United States v. Wilson, 578 F.2d 67, 72 (5th Cir. 1978) (government's evidence of separate drug transaction was *res gestae* and was not introduced to establish general propensity to commit crimes).

Judge Coleman argued references to Petitioner's membership in La Familia were improperly admitted and prejudicial in a Rule 33 motion for a new trial. (CR 111-359, doc.

no. 71.)  In denying the motion, Judge Hall determined Petitioner's trial was not prejudiced by references to La Familia, in light of the undisputed inculpating evidence which included Messrs. Danko's and Greene's testimonies, and audio and video recordings of Petitioner's efforts to consummate a controlled drug sale. (Id., doc no. 76.)   Judge Hall correctly determined that, "passing reference to statements made by Defendant himself concerning his gang membership cannot be said to have 'probably had a substantial influence on the jury's verdict.'"  (Id.)

Furthermore, Petitioner's admission to Investigator Danko he was involved with the La Familia cartel was not introduced to show a general propensity to commit bad acts, but instead to show motive and opportunity.  See United States v. Gordon, 496 F. App'x 579, 583 (11th Cir. 2012) (finding gang membership evidence admissible under 404(b) to show motive and opportunity).  Petitioner's membership in La Familia demonstrates his underlying motive as the seller in the controlled buy and explains how Petitioner might have obtained the large quantity of drugs he was selling.  Furthermore, Petitioner's ties to La Familia were introduced by Investigator Danko to explain why he initially released Petitioner; Petitioner's initial decision to cooperate provided law enforcement with an opportunity to implicate La Familia.  (Trial Tr. 126.)  Because Petitioner's admission he was a member of La Familia was introduced for a proper purpose under Rule 404(b), any objection Judge Coleman could have raised would have failed, and counsel did not perform deficiently by not making an objection under 404(b).

Petitioner has not established Judge Coleman's trial strategy was objectively unreasonable for not raising these evidentiary objections.  There is also no reasonable probability the outcome would have been different had Judge Coleman succeeded in keeping

these tangential facts from the jury, considering the weight of all remaining evidence of Petitioner's drug trafficking activities.

### 10.    Ground 1(k)

At trial, Judge Coleman introduced Petitioner's criminal history file generated by Officer Turner while Petitioner was being held in North Augusta.  (Trial Tr. 212-14.)  The criminal history file establishes Petitioner was a Mexican citizen with numerous aliases.  (Id. at 222.)  Investigator Danko testified that before interviewing Petitioner, he did not receive the criminal history file from Officer Turner, nor did he investigate whether Petitioner was indeed "Jamie Ceja."   Instead, Investigator Danko assumed Petitioner was Jamie Ceja because Petitioner presented a Georgia driver's license in that name, admitted to being born in California, and held himself out as a United States citizen.  (Id. at 212, 225.)  In Ground 1(k), Petitioner alleges counsel was ineffective for failing to challenge Investigator Danko's testimony that Officer Turner did not inform him of Petitioner's real name, or that Petitioner was a Mexican citizen.   Petitioner's only support for this claim is his opinion this was "simply not believable."  (Doc. no. 2, p. 11.)

This conclusory allegation cannot afford Petitioner with relief.  See Tejada, 941 F.2d at 1559.  To the extent Petitioner is challenging the credibility of the evidence, "credibility determinations are the exclusive province of the jury."  United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997).  By its verdict, the jury implicitly determined Investigator Danko's testimony was credible.  See Calderon, 127 F.3d at 1325.  Furthermore, "for testimony of a government witness to be incredible as a matter of law, it must be 'unbelievable on its face.'"  United States v. Rivera, 775 F.2d 1559, 1561 (11th Cir. 1985). Investigator Danko's testimony was  believable on its face.

Petitioner has not established Judge Coleman's trial strategy was objectively unreasonable for failing to challenge the credibility of this statement by Investigator Danko. There is no reasonable probability the outcome would have been different had Judge Coleman emphasized this minor point in closing or in Rule 29 or Rule 33 motions.

### 11.   Ground 1(l)

In Ground 1(l), Petitioner alleges Judge Coleman was ineffective for failing to challenge the allegedly inconsistent testimony by Investigator Danko and Mr. Greene concerning when Mr. Greene first contacted Investigator Danko.   (Doc. no. 2, p. 11.) However, their testimony was consistent, and Petitioner again mischaracterizes the testimony in an attempt to show deficient performance and prejudice.

Investigator Danko testified that on June 13, 2011, he initiated a raid of Mr. Greene's storage unit, uncovering 5.5 pounds of marijuana and a firearm.  (Trial Tr. 64.)  Investigator Danko further testified that he attempted to contact Mr. Greene on August 17, 2011, by leaving his DEA business card on Mr. Greene's car.  (Id. at 67, 176.)  Mr. Greene testified he contacted Investigator Danko on August 18, 2011, a day after he found the business card. (Id. at 174, 325.)  Mr. Greene testified he did not know when his storage unit was raided, but assumed it was raided within a day or two or on the same day he discovered the business card.  (Id. at 366.)  Both Investigator Danko and Mr. Greene testified they did not have any contact between June 13, 2011, and August 18, 2011.   (Id. at 176, 378.)   Mr. Greene admitted between June 13, 2011, and August 18, 2011, he continued to acquire and sell drugs.  (Id. at 378.)   Because there was no inconsistency between Messrs. Greene's and Danko's testimony, Judge Coleman was not ineffective for failing to raise this meritless argument at trial.

Petitioner has not established Judge Coleman's trial strategy was objectively unreasonable for failing to point out an inconsistency that did not exist.  Even if such an inconsistency had existed, there is no reasonable probability the outcome would have been different had Judge Coleman emphasized such an inconsequential point in closing or in Rule 29 or Rule 33 motions.

### 12.   Ground 1(m)

Petitioner argues in Ground 1(m)(i-ii) his counsel was ineffective for failing to argue Mr. Greene's testimony was inconsistent regarding the first time Petitioner sold drugs to Mr. Greene.  (Doc. no. 2, p. 11.)  Mr. Greene's testimony was not inconsistent on this point.  Mr. Greene testified Petitioner sold him four ounces of cocaine when they met for the first time, and at a later date after Petitioner was released from the transitional center and back in Atlanta, Petitioner sold him nine ounces of cocaine.  (Trial Tr. 314, 319.)  Mr. Greene references two separate times Petitioner sold cocaine to him, and his testimony is not inconsistent.  (See id.)  Judge Coleman was not deficient for failing to argue inconsistencies in Mr. Greene's testimony when there were none.  Even if such an inconsistency had existed, there is no reasonable probability the outcome would have been different had Judge Coleman emphasized such an inconsequential point in closing or in Rule 29 or Rule 33 motions.

In Ground 1(m)(iii-iv), Petitioner argues his counsel was ineffective for failing to challenge Mr. Greene's testimony that he did not have more than one cell phone, and had six to seven thousand dollars fronted to four people but did not bother to ask them about the money.  (Doc. no. 2, p. 11.)  Once more, Petitioner's only argument is this was "simply not believable."  (Id.)  Petitioner offers nothing more than his own subjective belief the jurors should have reached a different interpretation of the evidence, and this conclusory argument

cannot serve as the basis for relief in these collateral proceedings.  Mr. Greene's credibility was within the exclusive province of the jury.  See Calderon, 127 F. 3d at 1325.  The jury found Mr. Greene's testimony credible by rendering a guilty verdict.  See id.  Thus, Petitioner has not established his counsel's performance was deficient or prejudicial for failing to raise this conclusory claim.

In Ground 1(m)(v), Petitioner alleges Judge Coleman was ineffective for failing to reveal the "sloppiness" of the investigation by pointing out that law enforcement did not subpoena his or Mr. Greene's phone records.  (Id.)  When Judge Coleman cross-examined Mr. Greene, he made this very point in the following exchange:

| | |
|---|---|
| Judge Coleman: | And, again, did they ever ask you for your cell phone records? |
| Mr. Greene: | No, sir. |
| Judge Coleman: | Do you know if they obtained them by warrant? |
| Mr. Greene: | I don't know. |
| Judge Coleman: | So if we wanted to know the dates of communication between you and [Petitioner] . . . that would be one piece of evidence that might be useful to us; right? |
| Mr. Greene: | I don't understand what you mean by useful to you. |
| Judge Coleman: | So if we had the phone call records, then we would have an idea of the frequency and the dates and the times of your communication, wouldn't we? |
| Mr. Greene: | Probably. Yeah. |

(Trial Tr. 370.)

While the same point may not have been made with respect to Petitioner's phone

records, Petitioner has not established Judge Coleman's trial strategy was objectively unreasonable for failing to make this immaterial point.  Nor is there a reasonable probability the outcome would have been different had Judge Coleman emphasized such an inconsequential point in closing or in Rule 29 or Rule 33 motions.

Petitioner alleges in Ground 1(m)(vi) that Judge Coleman was ineffective for failing to argue Mr. Greene was pressured, intimidated, or coerced into framing Petitioner, alleging in support Mr. Greene met with Agent Lukich, Investigator Danko, and the prosecutor the morning before he took the stand.  Petitioner offers no support for his conclusory allegation of prosecutorial misconduct, and the record is likewise devoid of any suggestion the prosecution pressured, intimidated, or threatened Mr. Greene into framing Petitioner.  In fact, it is not at all surprising that the prosecution would meet with a witness to prepare for trial.  Accordingly, Petitioner's allegation in Ground 1(m)(vi) does not demonstrate his counsel was ineffective, and Petitioner has not shown either deficient performance or prejudice.  See United States v. Beale, 921 F.2d 1412, 1437 (11th Cir. 1991) (dismissing prosecutorial misconduct claim because there was "no evidence in the record, and [defendant] fails to cite any, that supports his accusation that government agents improperly coached . . . witnesses.").

D.   **Grounds Two, Three, Four, and Five**

In Grounds Two through Five, Petitioner alleges Judge Coleman was ineffective because he failed to challenge "prosecutorial misconduct" by AUSA Patricia Rhodes during closing argument, when she allegedly (1) encouraged jurors to "send a message" to the community by convicting Petitioner; (2) referred to Mr. Greene as "Investigator Greene"; (3) vouched for Mr. Greene's credibility; and (4) implied it would be a waste of taxpayer funds

to conduct a more thorough investigation.  (Doc. no. 2, pp. 13-19.)   Appellate counsel was also ineffective, says Petitioner, for failing to argue the impropriety of these remarks on appeal.

To establish prosecutorial misconduct, the remarks must be improper and must prejudicially affect the substantial rights of the defendant.  Eckhardt, 466 F.3d at 847.  "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different."  Id.  The Court must examine the statements in the context of the trial, and assess their impact on the jury.  United States v. Frank, 599 F.3d 1221, 1237 (11th Cir. 2010).  For a reversal, the misconduct must be so pronounced that it permeates the entire atmosphere of the trial.  United States v. Weinstein, 762 F.2d 1522, 1542 (11th Cir. 1985).

There can be no substantial prejudice where evidence of a defendant's guilt is overwhelming.  United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998); United States v. Gonzalez, 833 F.2d 1464, 1466 (11th Cir. 1987).  A curative instruction may render a prejudicial remark by the prosecutor harmless.  Johnson v. Alabama, 256 F.3d 1156, 1185 (11th Cir. 2001) ("[A]ny possible prejudice was cured by the trial court's correct jury instructions."); United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997) (citing United States v. Inglesias, 915 F.2d 1524, 1529 (11th Cir. 1990)).

### 1.    Ground Two

In Ground Two, Petitioner takes issue with the following statement made by AUSA Rhodes at closing:

> But if you want to see the Jamie Cejas of the world continue to be coming into the communities of Augusta, Georgia and other places selling their goods to your citizens, then return a not guilty verdict.  But

> if you want to say – send a message and say, no more; we're going to
> take out the suppliers so that there isn't the demand . . . then you find
> him guilty of conspiracy to distribute all of the drugs.

(Trial Tr. 456.)  Petitioner claims these remarks were improper under Baldwin v. Adams, 899

F. Supp. 2d 889, 904 (N.D. Cal. 2012), United States v. Sanchez, 659 F.3d 1252, 1256 (9th

Cir. 2011), and Sinisterra v. United States, 600 F.3d 900, 910 (8th Cir. 2010).  Petitioner has

failed to cite a single Eleventh Circuit opinion finding such comments improper or

prejudicial, and the opinions of other circuits are not binding on this Court.

Courts within the Eleventh Circuit have routinely held a "send a message" comment

by a prosecutor does not inflame a jury such that a defendant's right to a fair trial is

compromised.  See Willis v. Sec'y, Florida Dep't of Corr., No. 8:13-CV-560-T-30TBM,

2014 WL 2050857, at *4 (M.D. Fla. May 19, 2014) (finding prosecutor's argument asking

jury to "send a message" with verdict was not unduly prejudicial); Hall v. Thomas, 977 F.

Supp. 2d 1129, 1181 (S.D. Ala. 2013) (finding prosecutor's urging of jury to convict in order

to "send a message out to Monroe County" was not violation of clearly established federal

law and could not be basis for writ of habeas corpus under 28 U.S.C. § 2254).   A

prosecutor's "reference during closing argument to the drug problems of society and [a]

defendant['s] role[] in such problems [is] not unduly prejudicial or excessively

inflammatory."  United States v. Rojas, 553 F. App'x 891, 894 (11th Cir. 2014) (citing

United States v. Delgado, 56 F.3d 1357, 1370 (11th Cir. 1995)).

Furthermore, because evidence of Petitioner's guilt was overwhelming, as detailed

*supra*, AUSA Rhodes's closing comment to "send a message," did not affect Petitioner's

substantial rights nor deprive him of a fair trial.  See Gonzalez, 833 F.2d at 1466; Darden v.

Wainwright, 477 U.S. 168, 181-82 (1986) ("Overwhelming . . . evidence . . . reduced the

likelihood that the jury's decision was influenced by argument.").  Consequently, Petitioner cannot demonstrate prosecutorial misconduct, and he has not established Judge Coleman's trial strategy was objectively unreasonable for failing to assert an objection to AUSA Rhodes's statement during closing.  Nor can he establish prejudice.

## 2.    Ground Three

In Ground Three, Petitioner alleges his counsel was ineffective for failing to challenge AUSA Rhodes's reference to Mr. Greene as "a government agent" and an "investigator."  (Doc. no. 2, p. 15.)  Petitioner claims these remarks were improper and allowed the prosecutor to bolster Mr. Greene's credibility.  (Id. at 15-16.)  Specifically, Petitioner takes issue with the following statements:

> AUSA Rhodes:    Now, after that date, when Jerome Greene becomes a government agent – and I don't mean a law enforcement agent – but when he becomes an agent of the government, that is, he is working with the government, then no, he is no longer a conspirator and you cannot hold those drugs attributable to the conspiracy . . . .

> AUSA Rhodes:    Investigator Danko, what kind of car is Investigator Greene going to be in?

(Trial Tr. 95, 421.)

First, while explaining the law of conspiracy, AUSA Rhodes accurately stated Mr. Greene was not a "law enforcement agent" but was working for the government and could not be a coconspirator.  (Trial Tr. 421.)  Secondly, isolated references to Mr. Greene as an investigator and government agent did not result in a fundamentally unfair proceeding nor prejudicially affect Petitioner.  (Doc. no. 8, p. 35.)   The trial record as a whole makes it abundantly clear Mr. Greene was not an investigator or agent and, instead, was nothing more than an informant who was cooperating with law enforcement agents.  (Trial Tr. 33.)  When

first introduced in the government's opening argument, Mr. Greene is referred to as "a drug dealer." (<u>Id.</u>)  Throughout trial, Mr. Greene is consistently referred to as an informant or a cooperating witness.  (<u>Id.</u> at 293, 290, 186, 300.)  In closing, the prosecution refers to Mr. Greene as a "criminal."  (<u>Id.</u> at 455) ("You may not like the fact that many investigations have to deal with criminals to get other criminals.").

Petitioner has not established Judge Coleman's trial strategy was objectively unreasonable for failing to harp on the prosecutor's references to Mr. Green.  There is no reasonable probability the outcome would have been different had Judge Coleman challenged these remarks.

### 3.    Ground Four

In Ground Four, Petitioner argues his counsel was ineffective for failing to challenge the following statement by AUSA Rhodes during her closing argument:

> AUSA Rhodes:    You can believe, if you will, and you should believe if you believe Jerome Greene who sat before you and was a very credible witness, you should believe that or you can believe that all of the transactions he acknowledged between the two of them . . . are attributable to [Mr. Greene].

(Trial Tr. 426.)  Petitioner argues this statement allowed the prosecutor to "put the integrity and the prestige of the government behind the veracity of Mr. Greene."  (Doc. no. 2, p. 17.)

Improper vouching occurs when the prosecutor "places the prestige of the government behind the witness, by making explicit personal assurances of the witness's veracity, or if the prosecutor implicitly vouches for the witness's veracity by suggesting information not presented to the jury supports the witness's testimony."  <u>United States v. Sims</u>, 719 F.2d 375, 377 (11th Cir. 1983).  "This prohibition against vouching does not,

however, forbid prosecutors from arguing credibility; rather, it forbids arguing credibility based on the reputation of the government office . . . ." United States v. Lopez, 590 F.3d 1238, 1256 (11th Cir. 2009).

Even if a comment can be considered improper vouching, the remark must prejudicially affect the defendant's substantial rights, and "infect the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991). Although improper vouching is grounds for reversal, it may be cured if the remarks are not "substantially prejudicial" and any lingering prejudice is remediated by a jury instruction. Parker v. Allen, 565 F.3d 1258, 1274 (11th Cir. 2009) (citing United States v. Sarmiento, 744 F.2d 755, 762-65 (11th Cir. 1984)).

Here, the prosecutor did not argue Mr. Greene was credible by invoking the reputation of the government. See, e.g., United States v. Hylor, 353 F. App'x 361, 363 (11th Cir. 2009) (holding prosecutor's statements were not improper because prosecutor submitted to jury that [witness] was telling the truth). Importantly, Petitioner cannot assert this one comment caused his entire trial to become infected with unfairness so that he was denied due process. See Eyster, 948 F.2d at 1206. Even assuming *arguendo* the comment was improper, Judge Hall's jury instruction cured any possible prejudice by reminding the jury that attorney statements were not evidence and that it was up to the jury to determine credibility. (Trial Tr. 460); see, e.g., United States v. Pericles, 382 F. App'x 801, 807 (11th Cir. 2010) ("[E]ven if the comments were improper, we conclude they did not affect [defendant's] substantial rights because the court . . . instructed the jury that attorney statements were not evidence . . . .").

For these reasons, Petitioner has not established Judge Coleman's trial strategy was

objectively unreasonable for failing to assert an objection during closing argument on the basis of improper vouching.  There is also no reasonable probability the outcome would have been different had Judge Coleman asserted such an objection.

### 4.      Ground Five

Petitioner argues in Ground Five that Judge Coleman was ineffective for failing to challenge the prosecutor's remarks in closing, "which implied that tax payers should not have to pay for a thorough investigation."  (Doc. no. 2, p. 18.)

> AUSA Rhodes:      I also expect that you'll hear, but there's no fingerprints on all these items that were taken out of the storage unit. Again you got to ask yourself, well, do the police have any obligation to use their resources wisely? Do they have any obligation to do that? It is ridiculous to think that a man who directs agents to, not one, but two storage units in two different cities where there are stashes of hundreds of thousands of dollars worth of drugs aren't his . . . .

(Trial Tr. 429.)  Petitioner asserts this statement was improper and violated his Fifth, Sixth, and Fourteenth Amendment rights.  (Doc. no. 2, p. 18.)

Here, the prosecutor's statement was merely a comment on the evidence in direct rebuttal to Petitioner's argument that the failure to conduct fingerprint analysis indicated a poor investigation.  See United States v. Morris, 568 F.2d 396, 401 (5th Cir. 1978) (holding counsel may state his or her contention as to conclusions which jury should draw from evidence); Tejera v. McCollum, No. 07-20227-CIV-MORENO, 2008 WL 5102881, at *20 (S.D. Fla. Nov. 25, 2008) ("It is clear both from the prosecutor's statements, her explanation of her statement and from the trial court's ruling, that the prosecutor was not acting improperly, but was commenting on the evidence.").

Petitioner has thus not established Judge Coleman's trial strategy was objectively

unreasonable for failing to assert an objection during closing argument on this basis.  There is also no reasonable probability the outcome would have been different had Judge Coleman asserted such an objection.  See United States v. Guinn, 460 F. App'x 888, 889 (11th Cir. 2012) (finding comments that appealed to jurors' pecuniary interests as taxpayers did not show result of trial would have been different but for the comments).

> **E.**     **Ground Six**

In Ground Six, Petitioner argues his counsel was ineffective for failing to object and seek a mistrial because of sleeping jurors.  (Doc. no. 2, p. 20.)  Petitioner claims at least three jurors were sleeping, resulting in his conviction by a nine member jury.  (Id.)

During the prosecution's direct examination of Investigator Danko, the following exchange occurred:

| | |
|---|---|
| Judge Coleman: | Your Honor, could counsel approach? |
| Judge Hall: | Yes. |
| | [Side Bar as Follows] |
| Judge Coleman: | I can't tell but it looks like one juror in the back is dead asleep. |
| Judge Hall: | Well, I imagine they're tired by now.  But I've been paying attention to that. |
| Judge Coleman: | And the young man on the front, his head is just bobbing. |
| AUSA Rhodes: | Actually, yeah, the one in the front – |
| | . . . |
| | [Side Bar Concluded] |
| Judge Hall: | All right. Ladies and gentlemen, we've been in court for about an hour and a half, which is |

> usually my limit, so I'm going to give the jurors a short recess so you can use the restroom or have some refreshments or get some energy for the afternoon session.   So we'll take a 15-minute break here.

(Trial Tr. 81-82.)

During the afternoon session, the attorneys conferred again for scheduling purposes, and Judge Hall noted three jurors "at best are sleepy and have been sleepy for a while. They're in and out." (Id. at 140.)  Because of concern that cross examination of Investigator Danko would stretch late into the evening, Judge Hall dismissed the jurors for the day. (Id. at 145.)  The record contains no additional evidence of juror inattentiveness or sleeping and demonstrates Judge Hall gave the jury frequent breaks throughout trial to ensure attention and focus. (See, e.g., id. at 204.)

Defense counsel has a duty to raise a juror's inattentiveness to the court's attention. United States v. Curry, 471 F.2d 418, 422 (5th Cir. 1973).  Once the court is informed of a juror's alleged inattentiveness, the court is tasked with the initial decision whether to interrogate jurors.  United States v. Yonn, 702 F.2d 1341, 1345 (11th Cir. 1983) (finding trial court had broad discretion when confronted with an allegation of juror misconduct, including the initial decision of whether to interrogate jurors).  There is "no per se rule requiring an inquiry in every instance of alleged [juror] misconduct."  United States v.  Mathis, 554 F. App'x 856, 856 (11th Cir. 2014) (citing United States v. Hernandez, 921 F.2d 1569, 1577 (11th Cir. 1991)).  The decision to investigate allegations of jury misconduct rests within the sound discretion of the district court.  United States v. Cousins, 842 F.2d 1245, 1247 (11th Cir. 1988).  Not every incident of juror misconduct involving sleeping jurors requires a new trial.  See Clarke v. McNeil, No. 07-21934-CIV, 2010 WL 5884059, at *6 (S.D. Fla. Oct. 7,

2010) report and recommendation adopted in part, No. 07-21934-CIV, 2011 WL 767512 (S.D. Fla. Feb. 25, 2011).

Here, the record shows that Judge Hall was aware of juror inattentiveness and he indicated he was carefully watching the jury.  (Trial Tr. 81.)  When deciding to break for the day, Judge Hall acknowledged the jurors were sleepy, and that they were "in and out," but there is no indication in the record that the jurors were actually sleeping, or had been sleeping throughout significant portions of the trial.  Judge Coleman satisfied his duty to bring juror inattentiveness to the Court's attention, and the Court's decision not to interrogate the jurors was well within the Court's discretion.  See Yonn, 702 F.2d at 1345; Curry, 471 F.2d at 422.  More importantly, even if Petitioner could demonstrate jurors were actually sleeping, which he cannot, he must show bias or prejudice to his trial, which he has not proven.  United States v. Hernandez, 921 F.2d 1569, 1577-78 (11th Cir. 1991) ("We further note that the trial court's exercise of discretion will not be disturbed absent a showing of bias or prejudice to the defendant, which appellant has not argued or proven.").

Thus, Petitioner's due process rights were not violated, and Judge Coleman did not render ineffective assistance.  Petitioner cannot show Judge Coleman acted outside the wide range of reasonable professional assistance or the existence of a reasonable probability of a different outcome had Judge Coleman sought a mistrial or removal of the jurors.  See Clarke, 2010 WL 5884059, at *6.  Accordingly, this claim does not entitle Petitioner to relief.

**F.**   **Ground Seven**

In Ground Seven, Petitioner argues his counsel was ineffective because he vouched for the credibility of Investigator Danko during closing argument, in the following statement:

> Judge Coleman:      Should you believe Agent Danko? You must test his
> credibility like any other witness. Now I don't want you
> to be intimidated by the fact that he is a law enforcement
> officer.  And I think he's a good one.  I listened to his
> testimony.  He's a professional.  He's very skilled.  He's
> very detailed-oriented.

(Trial Tr. 447.)

Petitioner conveniently omits the remainder of counsel's statement that points out flaws in Investigator Danko's testimony, implies Investigator Danko intentionally misrepresented Petitioner's citizenship status in order to extradite Petitioner from Mexico, and implies Investigator Danko botched the investigation and tried to cover his tracks.  (Id. at 447-49.)   Judge Coleman then states in summary his belief "that the evidence in this case would give you ample reason to question the complete veracity of his testimony on some of these critical issues."  (Id. at 446-48.)

Petitioner cannot show Judge Coleman acted outside the wide range of reasonable professional assistance or the existence of a reasonable probability of a different outcome had Judge Coleman adopted a different strategy and more aggressively attacked Investigator Danko's credibility.

### G.      Ground Eight

In Ground 8(a), Petitioner argues Judge Coleman was ineffective for failing to challenge Judge Hall's remarks on "how hard the attorneys worked on the case."  (Doc. no. 2, p. 23.)   The record shows on the first day of trial, Judge Hall addressed the jury and provided preliminary instructions:

> Now, in any trial, lawyers are an indispensable ingredient.  Their work is very
> hard.  The lawyers in this case have prepared very diligently for this trial
> today.  They have spent many days and hours researching and investigating
> the case so that it may be presented to you in just a few hours.

(Trial Tr. 16.)

Petitioner claims these remarks were improper and "tend[ed] to favor the Government in the sense that the jury would sympathize with them for bringing the case and spending time, money and working so hard . . . that the jury would feel guilty if they never returned a guilty verdict."  (Doc. no. 2, p. 23.)  Petitioner misconstrues the plain meaning of Judge Hall's fair and evenly weighted remark and is patently frivolous.

In Ground 8(b), Petitioner asserts Judge Hall caused prejudice among the jury by commenting the attorneys "[would not] intentionally mislead [the jury] about what they heard or submitted or argued."  (Id.)  Petitioner also alleges the prosecutor committed fraud, perjury, and intentionally misled the jury in closing arguments.  (Id. at 24.)  Similar to Ground 8(a), Petitioner cannot demonstrate Judge Hall's comment was prejudicial because his comment applied to both the prosecutor and his own counsel.  Petitioner's contention the prosecutor committed perjury and fraud is conclusory and frivolous, as Petitioner does not point to any evidence in the record to support such an allegation.

Petitioner cannot show Judge Coleman acted outside the wide range of reasonable professional assistance by failing to object to these comments by Judge Hall.  Nor has Petitioner shown a reasonable probability of a different outcome had Judge Coleman adopted a different strategy and asserted these patently frivolous objections.

## H.    Ground Nine

In Ground Nine, Petitioner claims his counsel was ineffective for failing to object to the presence of DEA Agent Jamie Lukich at the prosecution's table during trial.  (Doc. no. 2, p. 25.)  Petitioner argues the combined presence of Investigator Danko and his supervisor,

Agent Lukich, bolstered the credibility of the prosecution's case.  (Id. at 26.)  Petitioner cites a single case suggesting it was error for a testifying officer to sit at the prosecutor's table. (Id.)

"Rule 615 of the Federal Rules of Evidence provides that witnesses may be excluded from the courtroom while a trial is ongoing so that they cannot hear the testimony of other witnesses."  United States v. Edwards, 526 F.3d 747, 757 (11th Cir. 2008).  A complaint on collateral review that the trial court failed to invoke the rule of sequestration of witnesses "does not raise a question that can be reached by federal habeas corpus, since such denial does not amount to a deprivation of . . . constitutional rights."  Mathis v. Wainwright, 351 F.2d 489, 489 (5th Cir. 1965).  "A criminal defendant has no constitutional right to exclude witnesses from the courtroom."  Edwards, 526 F.3d at 758.  If a party is not subject to the rule of sequestration, it is within the trial judge's discretion whether to allow the party's presence in the courtroom.  United States v. Newsom, 493 F.2d 439, 440 (5th Cir. 1974); see also United States v. Cox, 459 F.2d 986, 988 (5th Cir. 1972) ("Cox argues that it was error on the part of the District Court to permit the FBI case agent to sit at the counsel table with the Assistant United States Attorney who tried the case.  The record shows no abuse of discretion on the part of the Trial Court in permitting this virtually universal practice.").

Here, Agent Lukich was not a witness and did not testify.  (See generally Trial Tr.) Consequently, Rule 615 requiring sequestration of witnesses did not apply.  See Fed. R. Evid. 615.  The district court did not abuse its discretion in allowing Agent Lukich to sit at the prosecution's table, a common practice.  See Newsom, 493 F.2d at 440; Cox, 459 F.2d at 988.  Thus, Petitioner cannot demonstrate his counsel's performance was deficient for failing to object to Agent Lukich's presence.  See Chandler, 240 F.3d at 917.  Nor has Petitioner

shown a reasonable probability of a different outcome had Judge Coleman requested the removal of Agent Lukich from the prosecutor's table.

## I.     Ground Ten

In Ground Ten, Petitioner argues Judge Coleman was ineffective for failing to object to recordings and transcripts being sent to the jury room during jury deliberations.  (Doc. no. 2, p. 27.)   Petitioner argues the transcripts "allow[ed] the jurors to give too much weight to the evidence."  (Id.)  Petitioner also asserts appellate counsel was ineffective for failing to raise this issue on appeal.  (Id.)

At trial, the prosecution introduced a video recording of the controlled buy and audio recordings of two telephone calls from August 19, 2011, and August 20, 2011.  (Trial Tr. 91.)  These recordings were accompanied by transcripts, and the Court admitted both the recordings and transcripts into evidence.  (Id. at 90-92.)   The Court then provided a limiting instruction:

> Judge Hall:    Now I have admitted these transcripts for the limited and secondary purpose of helping you follow the content of the conversations as you listened to the recordings and also to help you identify the speakers.  But I am specifically instructing you that whether the transcripts correctly reflect the content of the conversations or the identity of the speakers is entirely for you to decide based upon your own evaluation of the testimony you've heard . . . if you determine that the transcripts in any way are incorrect or unreliable, you should disregard them to that extent.

(Id. at 97-98.)

It is "a well-established rule that a district court may permit a corroborative transcript of an audio recording to be admitted and provided to a jury during deliberations, so as to assist the jury in understanding the original recording."  United States v. Facey, 244 F. App'x

251, 259 (11th Cir. 2007).  "It is not error to allow a transcript to go into the jury room unless the defendant demonstrates the transcript is inaccurate or causes him specific prejudice." United States v. Tillman, 535 F. App'x 844, 846 (11th Cir. 2013); see also United States v. Nixon, 918 F.2d 895, 901 (11th Cir. 1990) ("[T]ranscripts are evidence admissible to assist the jury in identifying speakers, and . . . absent anything more than a generalized claim of prejudice, we will not find error in the transcripts being allowed in the jury room.").  If the accuracy of a transcript is disputed, each side must produce its own version of a transcript or its own version of the disputed portions.  Facey, 244 F. App'x at 259.

Here, the recordings and transcripts were properly admitted into evidence and published to the jury.  (Id. at 92.)  Petitioner does not argue the transcripts were inaccurate, but alleges a generalized claim of prejudice.  This claim is insufficient to allege error, and the transcripts were properly provided to the jury during deliberations.  See Facey, 244 F. App'x at 259.  Petitioner has not demonstrated Judge Coleman's failure to object was deficient performance.  Nor has Petitioner shown a reasonable probability of a different outcome had Judge Coleman adopted a different strategy and asserted these patently frivolous objections.

## J.    Ground Eleven

In Ground Eleven, Petitioner alleges Judge Coleman was ineffective for not objecting to Investigator Danko's intentional exaggeration of the value of confiscated drugs, permitting the jury to believe Petitioner's "status as a drug lord was a lot larger than what it really was." (Doc. no. 2, p. 28.)   Petitioner asserts Judge Coleman knew Investigator Danko was overstating the value but did not object.  (Id.)

Judicial review of counsel's performance is highly deferential, and it is presumed counsel's performance was reasonable and counsel "made all significant decisions in the

exercise of reasonable professional judgment." <u>Chandler v. United States</u>, 218 F.3d 1305, 1315, 1314 (11th Cir. 2000) (quoting <u>Strickland,</u> 466 U.S. at 689-90).  To overcome this presumption, petitioner must demonstrate "no competent counsel would have taken the action that [his] counsel did take." <u>Chandler</u>, 218 F.3d at 1315.  Counsel does not render ineffective assistance in deciding "not to pursue a particular line of defense without substantial investigation, so long as the decision was reasonable under the circumstances." <u>Streeter v. United States</u>, 335 F. App'x 859, 863 (11th Cir. 2009).  Counsel is not required to "pursue every path until it [bears] fruit or until all available hope wither[s]." <u>Foster v. Dugger</u>, 823 F.2d 402, 405 (11th Cir. 1987).

Here, Judge Coleman elicited much of the testimony regarding value of the drugs during cross examination of Investigator Danko:

| Judge Coleman: | And those drugs just in Richmond County were worth, what ballpark? |
|---|---|
| Investigator Danko: | The value? I covered it yesterday.  A wholesale kilogram can go from 30,000 to 35,000 a kilo.  He had one-and-a-half kilos in there.  So a high estimate would be 35 . . . . |
| Judge Coleman: | If [Petitioner] hadn't taken you to the drugs in Cobb County, Georgia, you wouldn't have found those either would you? |
| Investigator Danko: | Correct. |
| Judge Coleman: | And what was the value of those? |
| Investigator Danko: | Roughly a 90,000 to 100,000 for the cocaine and another 20,000, 25,000 for the methamphetamine . . . $300,000-$320,000 just wholesale . . . you're looking at close to $600,000 if you were to break that all up and sold it on the street. |
| Judge Coleman: | So [Petitioner] – he tried to do the right thing? |

| | |
|---|---|
| Investigator Danko: | I'm sorry? |
| Judge Coleman: | [Petitioner] tried to do the right thing? |
| Investigator Danko: | He did at first. Yes. |

(Trial Tr. 249-50.)

Judge Coleman elicited Investigator Danko's testimony regarding value in order to argue Petitioner "tried to do the right thing," by turning over a significant value of drugs to law enforcement.   (Id.)   Judge Coleman could have reasonably decided emphasizing Petitioner's willingness to cooperate and the monetary cost to him of his cooperation was a better strategy than challenging Investigator Danko on the value of the drugs.  See, e.g., Adams, 709 F.2d at 1446 (holding decision by counsel to ask for mercy instead of raising background issues was reasonable).  Because Judge Coleman's strategic decision was not so patently unreasonable no competent attorney would have chosen it, his performance was not deficient.  See id. at 1445.  Nor has Petitioner shown a reasonable probability of a different outcome had Judge Coleman adopted a different strategy and challenged Investigator Danko's valuation.

### K.    Ground Twelve

In Ground 12(a), Petitioner alleges Judge Coleman was ineffective for failing to object on hearsay grounds to the following testimony by Mr. Greene:

> Mr. Greene:   And then Mr. Danko's supervisor pulled out a picture of [Petitioner].   And when he did that, I guess he seen the expression on my face.   And he was like, your expression speaks a thousand words.   And just went from there and started discussing what was going on.

(Trial Tr. 325.)

42

Hearsay is a "statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). A statement can be admitted to provide context, so long as the statement is not admitted for the truth asserted. United States v. Wilson, 238 F. App'x 571, 574 (11th Cir. 2007). A statement offered to show its effect on the listener is not hearsay. Eaves v. Work Force Cent. Fla., 623 F. App'x 955, 960 (11th Cir. 2015).

Rather than being offered to prove the truth of the matter asserted, Mr. Greene offered this statement by the investigator to show the effect the picture had on him, and to provide context for his decision to become an informant. (See Trial Tr. 325-26.) Accordingly, it was not hearsay, and Judge Coleman was not deficient for failing to object. Nor has Petitioner shown a reasonable probability of a different outcome had Judge Coleman adopted a different strategy and objected to this immaterial statement.

In Grounds 12(b)-(c), Petitioner alleges Investigator Danko and Mr. Greene made hearsay statements when they identified Agent Lukich at the prosecution's table. (Doc. no. 2, pp. 30-31.) In Ground 12(d), Petitioner reasserts his claim in 12(a). (Id.) These statements are plainly not hearsay under Rule 801(c), and do not afford Petitioner relief. Nor has Petitioner shown a reasonable probability of a different outcome had Judge Coleman adopted a different strategy and objected to these immaterial statements.

In Grounds 12(e) and (f), Petitioner argues Judge Coleman should have introduced Agent Lukich's August 18, 2011 police report detailing Petitioner and Mr. Greene's prior dealings before the buy bust transaction, and cross examined Agent Lukich about it. (Doc. no. 2, p. 31.) Petitioner alleges this report is the only evidence detailing any prior dealings

between Petitioner and Mr. Greene.  (Id.)  Petitioner further argues Judge Coleman was ineffective for failing to call Agent Lukich as a witness because the recording of Petitioner's confession malfunctioned and Agent Lukich was the only individual who knew how or why the malfunction occurred.  (Id.)

Because Agent Lukich did not testify at trial, Petitioner did not have a right to cross examine him.  Petitioner has not shown Judge Coleman's strategic decision not to call Agent Lukich as a defense witness falls outside of counsel's wide range of reasonable professional assistance.  See Evans v. Sec'y, Florida Dep't of Corr., 699 F.3d 1249, 1268 (11th Cir. 2012) ("[W]e add the point that which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.") (internal quotations omitted).  Furthermore, Petitioner cannot establish prejudice.  Contrary to Petitioner's claims, Agent Lukich's police report was not the only evidence verifying Petitioner and Mr. Greene's prior transactions.  Mr. Greene himself testified to his numerous prior dealings with Petitioner that culminated in the buy bust transaction.

Also frivolous is Petitioner's allegation Agent Lukich should have been called as a witness because the recorded confession did not malfunction but was intentionally erased and would have shown a violation of Petitioner's Miranda rights.   (Doc. no. 2, p. 31.) Petitioner's unfounded conjectures do not establish Judge Coleman's performance was deficient.  See Borden v. Allen, 646 F.3d 785, 810 n.31 (11th Cir. 2011) ("[T]he petitioner is, or should be, aware of the evidence to support the claim before bringing his [habeas] petition . . . [A] habeas case is not a vehicle for a so-called fishing expedition . . . .").  In addition, as explained infra, Petitioner's Miranda rights were not violated.   For all these reasons,

Petitioner has not shown a reasonable probability of a different outcome had Judge Coleman called Agent Lukich as a witness.

In sum, Judge Coleman's strategic decisions criticized in Ground Twelve are not so patently unreasonable no competent attorney would have chosen them, and therefore his performance was not deficient.  See Devier, 3 F.3d at 1445.  Nor has Petitioner shown a reasonable probability of a different outcome had Judge Coleman adopted a different strategy as outlined in Ground Twelve.

### L.    Ground Thirteen

In Ground Thirteen, Petitioner alleges Judge Coleman was ineffective for failing to object on hearsay grounds to the following testimony by Investigator Danko concerning a lookout:

| AUSA Rhodes: | With respect to the transaction that had just occurred with Jerome Greene, did he indicate to you that anyone else besides he and Dias had been involved from [sic] on his end of the deal? |
| --- | --- |
| Investigator Danko: | He did say there was another person.  There was a third person in North Augusta that was also in the vehicle with them who was actually also surveilled during the Golden Corral surveillance.  But this person was dropped off for the purposes of being a lookout.  When this person was dropped off, he was actually dropped off about 15 feet from the surveillance vehicle I was in when he got out on foot and got on the phone.   He was part of the surveillance that would, you know, of course, notify [Petitioner] if he saw law enforcement. |

(Trial Tr. 113.)

| AUSA Rhodes: | Now, where in this diagram about Golden Corral – is Dias, did you see him there? |
| --- | --- |
| Investigator Danko: | Mr. Dias was observed by Investigator Shedree Woods with [Petitioner] and a third person that after the deal |

> was completed and Jerome Greene left the parking lot,
> [Petitioner] was observed then leaving the restaurant
> again with two other males that – one wearing a green
> shirt which was later identified as Ventura.  They got
> into the Kia and that's how the tag and vehicle
> description was transmitted to me by Investigator
> Shedree Woods.

(Id. at 190.)  Petitioner claims counsel's failure to object caused prejudice, and claims his appellate counsel was also ineffective for failing to raise this claim on appeal.  (Doc. no. 2, p. 32.)

Here, statements concerning a lookout were not essential to Petitioner's trial, and Petitioner cannot demonstrate prejudice in light of the overwhelming weight of evidence against him.  Petitioner was convicted under 21 U.S.C. § 841(a)(1), requiring the government to prove an agreement between two or more people to distribute drugs.  (CR 111-359, doc. no. 1, p. 1.)  The jury found a conspiracy between Petitioner and Mr. Greene, and this finding was upheld by the Eleventh Circuit on appeal.  Ceja, 543 F. App'x at 956-57.  Consequently, testimony regarding a lookout was wholly inconsequential, and Petitioner cannot demonstrate his counsel's failure to object to these comments rendered his criminal proceeding fundamentally unfair, or that the proceeding would have been different.  See Brooks, 719 F.3d at 1300.

### M.    Ground Fourteen

Grounds 14(a) and (b) merely restate Ground 1(j) and are rejected for the reasons already discussed *supra*.

### N.    Ground Fifteen

#### 1.    Ground 15(a)

In Ground 15(a), Petitioner argues Judge Coleman was ineffective for failing to

address Petitioner's alleged <u>Miranda</u> violations via a motion to suppress or objection at trial. (Doc. no. 2, p. 34.)  In his sworn affidavit, Petitioner alleges that after he was taken into custody, Officer Turner read Petitioner his <u>Miranda</u> rights and Petitioner immediately requested counsel.  (Doc. no. 2-1, p. 2.)  Petitioner alleges Officer Turner informed Petitioner he could have an attorney, but if Petitioner did not agree to speak without an attorney, Officer Turner would not recommend any leniency to a judge.  (<u>Id.</u>)  Petitioner claims he then agreed to speak to officers without an attorney, and when Investigator Danko arrived, he was reread his <u>Miranda</u> rights and signed the <u>Miranda</u> waiver.  (<u>Id.</u>)  On December 13, 2016, the Court held an evidentiary hearing on Ground 15(a).  At the hearing, the Court heard testimony from Petitioner, Officer Turner, and Judge Coleman.

### a.      Petitioner's Testimony

Petitioner testified he met with Officer Turner after he was arrested on August 20, 2011.  Court's recording system, *For the Record* (FTR) 10:07.55 – 10:08.00; 10:08.10 – 10:08.45.  Officer Turner asked Petitioner to sign the <u>Miranda</u> waiver without explaining it, if Petitioner "wanted to help [himself]," because Officer Turner told Petitioner he was "in a lot of trouble."  FTR 10:12.00 – 10:12.55.  Petitioner signed the <u>Miranda</u> waiver before Investigator Danko arrived.  FTR 10:13.55 – 10:14.00.  After Investigator Danko arrived, Officer Turner started "being aggressive" during questioning and told Petitioner "how bad it was going to be."  FTR 10:17.20 – 10:17.30.  Petitioner felt nervous and unequivocally invoked his right to counsel.  FTR 10:17.00 – 10:18.00.  After Petitioner requested counsel, Investigator Danko and Officer Turner left the investigation room.  FTR 10:18.20 – 10:19.00.

Investigator Danko returned, informed Petitioner the investigation was his

investigation, and told Petitioner they should restart the questioning.   FTR 10:19.00 – 10:19.10.  Officer Turner then reentered the room with a half kilogram of cocaine in a plastic bag, and the officers restarted the questioning.   FTR 10:19.15 – 10:19.33.   Neither Investigator Danko nor Officer Turner acknowledged Petitioner had invoked his right to counsel.  FTR 10:19.30 – 10:20.00.  In exchange for his cooperation, Investigator Danko and Officer Turner promised Petitioner that anything he said would not be used against him.  FTR 10:20.15 – 10:20.25.  Petitioner requested counsel again, and the officers reiterated that Petitioner did not need counsel.   FTR 10:20.40 – 10:20.55.  The officers promised to release Mr. Dias-Ventura, and also promised to release Petitioner if he agreed to cooperate.  FTR 10:21.00 – 10:21.20.

Investigator Danko and Officer Turner allowed Petitioner to call his wife, and Petitioner's wife encouraged Petitioner to "do the right thing."  FTR 10:21.55 – 10:22.05. Officer Turner presented Petitioner a second Miranda waiver form for him to sign, and promised Petitioner that if he signed the waiver he would be released and that nothing Petitioner said would be used against him.  FTR 10:22.30 – 10:24.00.   Petitioner signed the Miranda waiver a second time, and took the officers to two storage units containing narcotics.  FTR 10:25.00 – 10:25.45.  Petitioner explained he cooperated only because he was promised he would be released.  FTR 10:25.50 – 10:26.10.

On cross examination, Petitioner affirmed he only invoked his right to counsel after Investigator Danko arrived.  FTR 11:02.50 – 11:03.15.  Petitioner admitted his testimony in Court was inconsistent with his affidavit statement that he invoked his right to counsel to Officer Turner before Investigator Danko arrived.  FTR 11:31.00 – 11:31.45.  Petitioner asserted Judge Coleman should have filed a motion to suppress his statements and confession

48

because investigators continued to question him after he invoked his right to counsel.  FTR 11:08.00 – 11:08.30.

Petitioner testified he told Judge Coleman his most important defense was his purportedly illegal extradition from Mexico.  FTR 10:28.15 – 10:28.45.  Petitioner testified his extradition took up the bulk of his time with Judge Coleman, and they did not discuss the Miranda waiver or his invocation of counsel at length.  FTR 10:29.30 – 10:30.30.  However, Petitioner maintains he told Judge Coleman he invoked his right to counsel when he was interrogated, and that the officers promised Petitioner he would not be prosecuted if he cooperated by taking them to the drugs in the storage units.  FTR 10:30.30 – 10:31.00; 10:31.10 – 10:31.45.

Petitioner wrote at least seven letters to Judge Coleman, and in one undated letter Petitioner stated "for them to convince me not to ask for a lawyer they offer me [sic] is I work with them, they was [sic] going to give me federal witness protection, but, I have to give up what it was in the storages [sic] rooms and the half kilo deal was going to go away." (Pet'r's Ex. 1); FTR 10:36.00 – 10:36.50.  In a second letter dated January 30, 2012, Petitioner told Judge Coleman he was "brainwashed to do a confession."  FTR 10:37.55 – 10:40.10.  Petitioner testified this statement was an attempt to explain that officers persuaded him he did not need legal counsel by promising to release him if he cooperated.  FTR 10:39.55 – 10:40.08.  However, Petitioner admitted he never discussed this statement in his letter with Judge Coleman.  FTR 10:40.15 – 10:40.25.

### b.    Officer Turner's Testimony

After Petitioner was detained, Officer Turner suggested to Petitioner that he should cooperate, and Petitioner was eager to strike a deal in exchange for his cooperation.  FTR

11:42.15 – 11:42.50.   There was a sense of urgency if Petitioner intended to cooperate because Petitioner would lose the opportunity to become an informant as news of his arrest spread.   FTR 11:42.20 – 11:42.55.   Officer Turner testified Petitioner signed a <u>Miranda</u> waiver in front of both him and Investigator Danko, but does not recall why Petitioner signed the <u>Miranda</u> waiver twice.   FTR 11:45.00 – 11:46.00.   Officer Turner testified Petitioner never asked for an attorney, affirmatively waived his <u>Miranda</u> rights, and signed the waiver not once but twice.   FTR 11:46.10 – 11:47.00.

Officer Turner also testified neither he nor Investigator Danko made Petitioner any promises in exchange for his cooperation, despite Petitioner's requests for concrete deals and absolution.   FTR 11:52.00 – 11:52.25.   Officer Turner told Petitioner he was unwilling to engage in any negotiation and could only state that any cooperation would be communicated to prosecuting authorities, defense counsel, and a judicial officer.   FTR 11:52.15 – 11:52.45. On cross examination, Officer Turner stated he did not make Petitioner any promises because it was standard law enforcement practice not to make any promises, and he did not have the authority to determine who would be prosecuted.   FTR 11:57.00 –11:58.00.   Had Petitioner requested counsel, Officer Turner would have stopped all further interrogation and asked Petitioner to sign an invocation of <u>Miranda</u> rights form, all of which is required by standard law enforcement protocol.   FTR 11:59.30 – 12:00.10.

### c.   Judge Coleman's Testimony

Judge Coleman practiced law for more than thirty years before becoming a United States Bankruptcy Judge in 2013.   FTR 12:03.30 – 12:09.58.   In his many years of practice, Judge Coleman represented criminal defendants in more than thirty federal criminal cases and more than 150 state criminal cases.   FTR 12:04.15 – 12:05.30.

50

Judge Coleman testified he met with Petitioner at length at least nine times before trial.  FTR 12:09.00 – 12:10.00.  In their initial meeting, Judge Coleman recalled Petitioner was very comfortable, was neither scared nor bewildered by the criminal process, and was candid and very intelligent.  FTR 12:12.03 – 12:13.45.  Because of Petitioner's lengthy criminal history, Judge Coleman described Petitioner as "an old hand" at criminal prosecutions, and noted Petitioner had previous convictions in Cobb County, Georgia for marijuana trafficking, and served time in Arkansas as well.  FTR 12:12.00 – 12.12.05; 12:15.00 – 12:16.00.  In their meetings before trial and in numerous letters sent to Judge Coleman, Petitioner expressed his desire to litigate the issue of his arrest and removal from Mexico as his primary defense.  FTR 12:19.45 – 12:20.45.

Judge Coleman testified at no point in his representation did Petitioner ever say that he invoked his right to counsel during the interrogation by Investigator Danko and Officer Turner.  FTR 12:22.40 – 12:22.59.  Petitioner never disputed being Mirandized, and told Judge Coleman he waived his <u>Miranda</u> rights twice.  FTR 12:26.50 – 12:27.10.  Judge Coleman testified of his understanding that a custodial statement is subject to suppression if involuntary or coerced, and once someone in custody requests counsel, investigators are required to stop interrogation.  FTR 12:27:40 – 12:28.30; 12:28.15 – 12:28.29.  Had Petitioner told Judge Coleman he invoked his right to counsel and it was not honored, Judge Coleman "would have remembered it . . . if [he] remembered nothing else."  FTR 12:28.10 – 12:28.30.

Judge Coleman confirmed his receipt of a letter from Petitioner stating "for them to convince me not to ask for a lawyer, they offered [to work with me]."  Judge Coleman testified that, in his opinion, a "fair reading" of this statement was Petitioner did not ask for

51

an attorney.  FTR 12:48.00 – 12:49.05; 12:49.15 – 12:49.35.  As for Petitioner's statement in another letter that he was "brainwashed to do a confession," Judge Coleman understood from the context of his discussions with Petitioner that this referred to Petitioner's belief he had made a deal with the officers and that deal was later taken "off the table."  FTR 12:54.55 – 12:55.57.

Judge Coleman testified Petitioner never once suggested he was coerced into giving a confession or invoked his right to counsel.  FTR 12:28.50 – 12:29.30.  Judge Coleman also affirmed Petitioner never mentioned in correspondence he was tricked or coerced into giving a confession or that he invoked his right to counsel.  FTR 12:42.10 – 12:42.24.  Accordingly, Judge Coleman did not see any grounds to file a motion to suppress Petitioner's custodial statements to Officer Turner and Investigator Danko.  FTR 12:34.06 – 12:34.59.

### d.    Credibility Determination

The threshold issue relates to credibility because there is divergence in testimony between Petitioner on one hand and Officer Turner and Judge Coleman on the other.  "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."  United States v. Williams, 731 F.3d 1222, 1230 (11th Cir. 2013) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing credibility determinations are within province of the factfinder); Carr v. Schofield, 364 F.3d 1246, 1264-65 (11th Cir. 2004) (recognizing court's opportunity to observe and study witnesses and make credibility determinations concerning ineffective assistance claim).  In making its credibility determination, the Court must take into consideration not only the

interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citation omitted).

The Court finds Judge Coleman and Officer Turner's testimony far more credible than Petitioner's testimony. Judge Coleman practiced as an attorney for many years, is well-known to the Court, and has demonstrated himself to be a highly-qualified, ethical, and zealous advocate for his clients. His thorough preparation for the habeas hearing was evident and appreciated. Judge Coleman candidly admitted he did not recall every conversation with Petitioner, but remembered the focus of his defense was Petitioner's removal from Mexico.

Judge Coleman unequivocally testified numerous times Petitioner never once told him he invoked his right to counsel during his interrogation. Furthermore, Judge Coleman testified (1) he was aware invocation of the right to counsel requires investigators to cease all questioning until counsel is present; and (2) had Petitioner told him he invoked his right to counsel and this right was not honored, Judge Coleman would have remembered it.

Judge Coleman's testimony is strengthened by his correspondence with Petitioner before trial. Petitioner wrote Judge Coleman at least seven letters detailing Petitioner's removal from Mexico and urging Judge Coleman to pursue this line of defense. (Doc. no. 8-5, p. 4.) In his numerous letters to Judge Coleman, Petitioner never once stated he invoked his right to counsel and this right was not honored, such that Judge Coleman was on notice of the need to file a motion to suppress. Accordingly, the Court finds Judge Coleman's testimony to be highly credible and supported by the record.

The Court also finds Officer Turner to be highly credible. Officer Turner was candid and direct. Officer Turner accurately recalled the events surrounding Petitioner's arrest, admitted he was unsure why Petitioner signed multiple Miranda waivers, and affirmed

53

Petitioner was Mirandized twice and signed two waivers. Officer Turner stated unequivocally that at no time during the interrogation did Petitioner request counsel. Had Petitioner invoked his right to counsel, all questioning would have ceased and Officer Turner would have confirmed by Petitioner's execution of a <u>Miranda</u> invocation form. The Court finds Officer Turner's testimony to be highly credible and supported by the record. Indeed, it is undisputed Petitioner signed two forms waiving his right to counsel during questioning by Officer Turner and Investigator Danko. (Pet'r's Exs. 5, 6.)

In contrast, Petitioner's testimony is not credible and is contradicted by his sworn statement in support of his § 2255 motion. In support of Ground 15(a), Petitioner stated Officer Turner brought Petitioner to a room upon his arrest and read him his <u>Miranda</u> rights, and Petitioner immediately asked for an attorney. (Doc. no. 2-1, p. 2.) After Investigator Danko arrived, questioning began because Investigator Danko was not aware Petitioner had requested counsel. (<u>Id.</u>) However, at the hearing, Petitioner testified he invoked his right to counsel during the meeting with Investigator Danko and Officer Turner, and never made an earlier request for counsel to Officer Turner before Investigator Danko's arrival. FTR 11:02.50 – 11:03.15. When confronted with this inconsistency at the hearing, Petitioner provided evasive answers and did not resolve the discrepancy. FTR 11:31.00 – 11:31.45. Furthermore, although Petitioner claimed in his affidavit that Officer Turner threatened he would "not recommend any leniency to the judge" if Petitioner invoked his right to counsel, Petitioner never raised this allegation at the hearing. Finally, Petitioner's testimony that he invoked his right to counsel is undercut significantly by the undisputed fact he signed two forms waiving his right to counsel. (Pet'r's Exs. 5, 6.)

For all these reasons, the Court does not find Petitioner's testimony credible regarding

(1) his alleged invocation of his right to counsel; and (2) his alleged statements to Judge Coleman regarding the same.

### e.    Judge Coleman Was Not Ineffective.

To demonstrate Judge Coleman was ineffective, Petitioner must show Judge Coleman performed deficiently, and this deficient performance caused prejudice. Strickland, 466 U.S. at 687. Based on the evidence and testimony presented at the evidentiary hearing, the Court finds § 2255 relief is unwarranted on this claim.

Judge Coleman's performance was not constitutionally deficient with respect to any portion of his handling Petitioner's waiver of his Miranda rights. Petitioner claims he invoked his right to counsel but was coerced into signing a Miranda waiver, and therefore Judge Coleman should have filed a motion to suppress based on this alleged Miranda violation, or otherwise objected at trial to the manner in which the evidence used against him was obtained. However, the credible testimony at the evidentiary hearing, as described in detail above, not only shows that Petitioner's waiver of Miranda rights was valid, but that even if everything occurred as Petitioner incredibly claims, Petitioner never informed Judge Coleman of a problem.

In his many communications with Judge Coleman, Petitioner never claimed he invoked his right to counsel, and instead maintained he was Mirandized and waived his right to counsel. FTR 12:26.50 – 12:27.10. Petitioner made three statements in letters to Judge Coleman regarding his waiver of counsel, but those statements were woefully insufficient to notify Judge Coleman of a valid basis for a suppression motion. In one undated letter, Petitioner claims he was "nervous and hesitant to ask for a lawyer." (Doc. no. 8-5, pp. 13-14.) In another undated letter, Petitioner states "for them to convince me not to ask for a

lawyer, they offered [to work with me]." (Pet'r's Ex. 1.)  Finally, in a letter dated January 30, 2012, Petitioner claims he was "brainwashed to do a confession." (Pet'r's Ex. 2.)

Judge Coleman reasonably interpreted Petitioner's statements in his letters to mean that Petitioner did not invoke his right to counsel.  Indeed, none of Petitioner's statements demonstrate he unequivocally invoked his right to counsel before Investigator Danko or Officer Turner.  See Davis v. United States, 512 U.S. 452, 459 (1994) ("[T]he suspect must unambiguously request counsel . . . [H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.").  Although Petitioner claims he was "brainwashed to do a confession," and alleges Judge Coleman should have interpreted this to mean officers persuaded Petitioner he did not require legal counsel, there is no support for such an inference, as Petitioner admitted he never discussed his "brainwashing" claim with Judge Coleman.  FTR 10:40.15 – 10:40.25.  Furthermore, Petitioner's statement he was "nervous and hesitant to ask for counsel," suggests he never requested counsel.  Indeed, this statement is inapposite to Petitioner's hearing testimony where he adamantly stated he requested counsel upon being interrogated by Investigator Danko and Officer Turner.

As for Petitioner's statement "for them to convince me not to ask for a lawyer, they offered [to work with me]," the Court finds this cryptic statement insufficient to have alerted Judge Coleman of the need to file a motion to suppress.  Like Petitioner's other statements, this statement does not demonstrate Petitioner unequivocally invoked his right to counsel.  In addition, this single statement in an undated letter pales in comparison to the discussions, in more than nine pre-trial meetings and numerous other letters Petitioner sent Judge Coleman, wherein Petitioner never contended he invoked his right to counsel and instead urged Judge

Coleman to focus on the allegedly illegal extradition.  Only in hindsight, with the benefit today of Petitioner's unequivocal, but not credible, habeas allegation that he did invoke counsel but was ignored, could someone even possibly understand this cryptic statement in one letter to mean he invoked his right to counsel.  However, hindsight is not the proper perspective.  See Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (cautioning courts that in reviewing counsel's performance, courts must avoid "distorting effects of hindsight" and evaluate reasonableness of counsel's performance "from counsel's perspective at the time.").

Nor did Petitioner inform Judge Coleman of any coercion issue related the waiver of his Miranda rights.  In their many discussions, Petitioner never suggested to Judge Coleman that he was coerced.  (Doc. no. 8-5, pp. 8-9); FTR 12:28.50 – 12:29.30.  Judge Coleman also affirmed Petitioner never stated in correspondence that he was coerced into giving a confession.  FTR 12:42.10 – 12:42.24.  Because the credible testimony establishes Petitioner never informed Judge Coleman of any problem related to an alleged violation of his Miranda rights, Judge Coleman acted in an objectively reasonable manner by not filing a motion to suppress or otherwise objecting at trial to the use of evidence obtained as a result of Petitioner's valid waiver of his rights.  See Aleem v. McDonough, No. 3:05CV453/LAC/EMT, 2007 WL 1225404, at *6-8 (N.D. Fla. Apr. 25, 2007) (finding petitioner's failure to inform counsel of Miranda violation resulted in petitioner's failure to demonstrate counsel's performance was unreasonable).  Petitioner has failed to demonstrate that based on the facts as presented to Judge Coleman at the time, "no competent counsel" would have made the same strategic choice to not file a motion to suppress.  Accordingly,

Petitioner has not demonstrated Judge Coleman's performance was deficient.   See Strickland, 466 U.S. at 690.

Additionally, Petitioner cannot show prejudice because the credible facts from the evidentiary hearing conclusively demonstrate Petitioner's Ground 15(a) claims are meritless. Based on the factual findings outlined above, the Court concludes Petitioner did not invoke his right to counsel, signed the Miranda waivers, and confessed to dealing narcotics without any coercion on the part of law enforcement.  The Court specifically credits Officer Turner's testimony that he read Petitioner his Miranda rights, Petitioner never requested counsel during his interrogation, and Petitioner knowingly and voluntarily signed the Miranda waiver twice.   Although Petitioner alleges he was coerced because Officer Turner threatened Petitioner that if he did not cooperate, Officer Turner would not "recommend any leniency to the judge," (doc. no. 2, p. 34), the Court finds Officer Turner did not make such a statement.

Furthermore, Officer Turner never made Petitioner any promises in exchange for his cooperation, merely encouraged Petitioner to cooperate, informed Petitioner if he intended to cooperate he would need to do so quickly, and told Petitioner his cooperation would be communicated to the assigned judge.   FTR 11:52.00 – 11:52.25.   Such conduct is not improper.   See United States v. Mercer, 541 F.3d 1070, 1075–76 (11th Cir. 2008) (finding waiver voluntary where agent approached defendant "about the possibility of a cooperation agreement."); United States v. Nash, 910 F.2d 749, 752 (11th Cir. 1990) (finding defendant was not coerced when officer informed him of realistically expected penalties and encouraged him to tell truth); United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir. 1985) ("A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him

is not a sufficient inducement so as to render a subsequent incriminating statement involuntary.").

On the credible facts, any motion to suppress or trial objection alleging a <u>Miranda</u> violation, to include Petitioner's coercion argument, would have been meritless and denied, thus Judge Coleman could not have rendered ineffective assistance by failing to raise the issues.  <u>See</u> <u>Ladd v. Jones</u>, 864 F.2d 108, 110 (11th Cir. 1989) ("[S]ince these claims were meritless, it was clearly not ineffective for counsel not to pursue them."); <u>Thomas v. United States</u>, 596 F. App'x 808, 810 (11th Cir. 2015) (acknowledging that even if failing to object to trial testimony could be considered deficient, ineffective assistance claim fails because no showing of prejudice); <u>United States v. Harris</u>, 613 F. Supp. 2d 1290, 1299 (S.D. Ala. 2009) (finding counsel was not ineffective for failing to file motion to suppress alleging <u>Miranda</u> violation when evidentiary hearing testimony conclusively demonstrated motion to suppress was meritless).

In sum, Judge Coleman was not ineffective in his handling of Petitioner's alleged <u>Miranda</u> violations because he was not aware of any facts suggesting Petitioner invoked his right to counsel or was coerced in any way.   Furthermore, Petitioner cannot establish prejudice because the credible facts demonstrate Petitioner never invoked his right to counsel, signed the <u>Miranda</u> waivers voluntarily, and freely spoke with law enforcement.

### 2.    Ground 15(b)-(c)

In Ground 15(b)-(c), Petitioner argues counsel was ineffective for failing to "investigate and interview" Officer Turner.  (Doc. no. 2, p. 35.)  Petitioner claims he was deprived of the opportunity to confront Officer Turner about the recording malfunction.  (<u>Id.</u> at 35.)  Furthermore, had Officer Turner informed Investigator Danko about Petitioner's true

name and nationality, "it would have proven law enforcement intentionally extradited [Petitioner] back to the United States illegally and this would have resulted in acquittal." (Id.)

Counsel's decision not to call Officer Turner as a witness was a strategic decision entitled to deference. As counsel declares, "I was torn about the wisdom of bringing Turner in as a defense witness . . . I had no reason to believe his testimony would deviate from his written report, which would only bolster [Investigator] Danko's version of the custodial statements." (Coleman Decl. 11-12.) Both choices involved risk, and Judge Coleman's decision not to call Officer Turner as a witness is not so patently unreasonable no competent attorney would have chosen it. Nor has Petitioner shown a reasonable probability of a different outcome had Judge Coleman adopted a different strategy and called Officer Turner to testify.

Petitioner's claim law enforcement illegally extradited him back to the United States is procedurally barred because the Eleventh Circuit rejected this claim on direct appeal. Ceja, 543 F. App'x at 952-53; see Nyhuis, 211 F.3d at 1343 ("The district court is not required to reconsider claims of error that were raised and disposed of on direct appeal."). On appeal, Petitioner argued the district court did not have personal jurisdiction because law enforcement withheld his true identity in order to extradite him. Ceja, 543 F. App'x at 952. The Eleventh Circuit held Petitioner's seizure and transfer from Mexico did not defeat personal jurisdiction under the *Ker-Frisbie* doctrine. Id. at 953. Under the *Ker-Frisbie* doctrine, criminal defendants cannot defeat personal jurisdiction by asserting they were brought under the court's jurisdiction through illegal means. Id. Consequently, Petitioner's

claims which challenge the underlying legality of his extradition cannot be reconsidered by this Court on collateral review.  See Nyhuis, 211 F.3d at 1343.

### O.    Appellate Counsel Was Not Ineffective

In several of his grounds, Petitioner states in conclusory fashion that appellate counsel was ineffective for failing to raise Judge Coleman's alleged ineffective assistance on direct appeal.  (See generally doc. no. 2.)  However, Judge Coleman was not ineffective as discussed *supra*, and accordingly, appellate counsel was not ineffective for failing to raise Petitioner's meritless claims on appeal.  See Nyhuis, 211 F.3d at 1344; Winfield, 960 F.2d at 974.

### P.    Petitioner's New Claims Are Untimely and Do Not Relate Back to His Original Petition.

Petitioner's judgment of conviction became final on January 16, 2013, and was affirmed by the Eleventh Circuit on November 4, 2013.  Petitioner did not file a petition for a writ of certiorari, and his conviction became final on February 3, 2014.  Nguyen v. United States, 420 F. App'x 875, 877 (11th Cir. 2011) ("[T]he conviction becomes final after the [ninety]-day time period for filing a petition for *certiorari* expires.").  Petitioner had one year from February 3, 2014, to file his § 2255 motion, and Petitioner timely filed his § 2255 motion on January 27, 2015.  However, Petitioner's motion to amend filed on October 12, 2016, was filed more than two years after his criminal conviction became final, and more than one year after he filed his § 2255 motion.  In his motion to amend, Petitioner seeks to add the new claim that the sentencing court imposed an "illegal general sentence" which exceeded the statutory maximum.  (Doc. no. 11.)  Petitioner's new claim is only timely if it relates back to his original motion or if he is entitled to tolling of the statute of limitations.

First, Petitioner's new claim does not relate back to his original motion and is time-barred.  Under Federal Rule of Civil Procedure 15(c), an amended claim relates back to the date of the original pleading if it "arose out of the conduct, transaction, or occurrence set out or attempted to be set out -- in the original pleading . . . ."  Fed. R. Civ. P. 15(c)(1)(B).  Rule 15(c) is narrow; it does not contemplate the addition of "an entirely new claim based on a different set of facts."  Farris v. United States, 333 F.3d 1211, 1215 (11th Cir. 2003) (citing Pruitt v. United States, 274 F.3d 1315, 1318 (11th Cir. 2001)).  Thus, "to relate back, an untimely claim must have more in common with the timely filed claim than the mere fact that they arose out of the same trial or sentencing proceeding."  Farris, 333 F.3d at 1215 (citing Davenport v. United States, 217 F.3d 1341, 1344 (11th Cir. 2000)).  As the Eleventh Circuit has explained:

> The key consideration is that the amended claim arises from the same conduct and occurrences upon which the original claim was based.  This may be the case even if one or both claims do not explicitly state supporting facts. When the nature of the amended claim supports specifically the original claim, the facts there alleged implicate the original claim, even if the original claim contained insufficient facts to support it.  One purpose of an amended claim is to fill in facts missing from the original claim.

Dean v. United States, 278 F.3d 1218, 1222 (11th Cir. 2002).  In other words, at issue here is whether the amended claim is merely an attempt to "flesh out" an original claim, or if the amended claim relies upon different facts.

Here, Petitioner's original § 2255 motion gave no indication as to the factual basis of his current claim – that his sentence was illegal because the Court improperly sentenced him above the statutory maximum.  In spite of Petitioner's numerous grounds for relief in his original motion, not one ground alleges the Court erred in calculating Petitioner's sentence such that his sentence was illegal or above the statutory maximum.  (See generally, doc. nos.

1, 2.)  Thus, Petitioner's new claim does not relate back his original motion and is barred as untimely.  See Farris, 333 F.3d at 1215.

Second, Petitioner is not entitled to equitable tolling on his new claim.  Equitable tolling can be applied to prevent the application of AEDPA's statutory deadline, but only if a petitioner "shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing."  Holland v. Florida, 560 U.S. 631, 649 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)); see also Lawrence v. Florida, 549 U.S. 327, 336 (2007).  Nevertheless, equitable tolling is typically applied sparingly, Steed v. Head, 219 F.3d 1298, 1300 (11th Cir. 2000), and is available "only in truly extraordinary circumstances."  Johnson v. United States, 340 F.3d 1219, 1226 (11th Cir. 2003).  The petitioner bears the burden of proving his entitlement to equitable tolling and will not prevail based upon a showing of either extraordinary circumstances or diligence alone; the petitioner must establish both.  See Damren v. Florida, 776 F.3d 816, 822 (11th Cir. 2015).

Consideration of an otherwise untimely petition for federal habeas corpus relief may also be appropriate upon a showing that a "fundamental miscarriage of justice" has occurred, whereby "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  McQuiggin v. Perkins, 469 U.S.-, 133 S. Ct. 1924, 1931 (2013) (citing Murray v. Carrier, 477 U.S. 478, 495-96 (1986)); see also Wyzykowski v. Dep't of Corr., 226 F.3d 1213, 1218-19 (11th Cir. 2000).  The actual innocence exception "is exceedingly narrow in scope," and a time-barred petitioner seeking to invoke it must be able "(1) to present 'new reliable evidence . . . that was not presented at trial,' and (2) to show 'that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a

reasonable doubt' in light of the new evidence." <u>Rozzelle v. Sec'y, Fla. Dep't of Corr.</u>, 672 F.3d 1000, 1011 (11th Cir. 2012) (citations omitted), *cert. denied*, 133 S. Ct. 351 (2012).  As the Supreme Court emphasized, "The miscarriage of justice exception, we underscore, applies to a <u>severely confined</u> category:  cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" <u>McQuiggin</u>, 133 S. Ct. at 1933 (emphasis added).

Here, Petitioner has not shown that extraordinary circumstances prevented him from timely filing his new claim.  Further, Petitioner has not presented any evidence, much less new evidence, to suggest that he did not commit the offenses of which the jury found him guilty of after a three-day trial.  Indeed, Petitioner's supplemental claim does not assert innocence of his crimes of conviction, but only that his sentence is illegal because it exceeded the statutory maximum penalty for the crimes of which he was convicted.  Thus, neither equitable tolling nor the actual innocence exception applies to toll his statute of limitations.  Accordingly, Petitioner's supplemental claim is entirely new, based on different facts, is untimely, and the motion to amend should be **DENIED**.  (Doc. no. 11.)

## III.    CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Petitioner's motions to appoint counsel (doc. no. 22; CR 111-359, doc. no. 119) be **GRANTED IN PART** and **DENIED IN PART**, Petitioner's motion to amend be **DENIED** (doc. no. 11), Petitioner's § 2255 motion be **DENIED**, this civil action be **CLOSED**, and a

final judgment be **ENTERED** in favor of Respondent.[2]

SO REPORTED and RECOMMENDED this 21st day of March, 2017, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[2] The Court **DIRECTS** the **CLERK** to mail this R&R and accompanying order to Plaintiff at his present place of incarceration, McDuffie County Jail, 751 Public Safety Drive, Thomson, Georgia 30824.